[Civ. No. 2533.   Third Appellate District.—December 29, 1922.]

STANDARD LUMBER COMPANY (a Corporation), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION OF THE STATE OF CALIFORNA et al., Respondents.

[1] WORKMEN'S COMPENSATION ACT — EVIDENCE — AFFIRMANCE OF AWARD.—Where two rational conclusions may be drawn from the evidence, one in favor of and one against an award made by the Industrial Accident Commission, the award may not be disturbed.

[2] ID.—INJURY TO EMPLOYEE OF LUMBER COMPANY—RUNNING AWAY OF PUSH-CAR—SCOPE OF EMPLOYMENT—SUFFICIENCY OF EVIDENCE. In this proceeding to review an award of compensation for injuries received by an employee of a lumber company after quitting time from the running away of a push-car on which he was riding between the place of work and the camp of the employees maintained by the company, there was substantial evidence to support the findings that he was employed to take the car in and that his negligence, if any, was within the scope of his employment.

PROCEEDING in Certiorari to review an award of the Industrial Accident Commission.   Award affirmed.

The facts are stated in the opinion of the court.

Morrison, Dunne & Brobeck for Petitioner.

A. E. Graupner for Respondents.

ANDERSON, J., *pro tem.*—The proceeding is to review an award made by the Industrial Accident Commission to

---

2.   Conclusiveness of finding of Industrial Commission as to whether injury was one "arising out of and in the course of" the employment, notes, Ann. Cas. 1916B, 475; Ann. Cas. 1918B, 647; L. R. A. 1916A, 266; L. R. A. 1917D, 188; L. R. A. 1918F, 915.

respondent, Thomas Truman, on account of injuries alleged to have been suffered by him while acting as the employee of the petitioner, Standard Lumber Company. Our consideration is limited to the determination of the question as to whether there was evidence to support the jurisdiction of the commission to make the award—whether at the time Truman was injured he was an employee, working in the course of his employment. The word "respondent" when used herein will refer particularly to the respondent Truman.

The respondent was injured during the running away of a push-car belonging to the petitioner. The push-car had been placed on a railroad track at a place where petitioner was having work done upon its railroad. The car ran away on a trip over the portion of the railroad track between the place of work and a central camp or headquarters, maintained by petitioner. No one testified directly as to exactly how the respondent suffered injury. The respondent could not recall what occurred immediately before he was hurt, and he was unconscious for forty hours after the accident.

Petitioner's points are as follows: First, that the injured employee, Truman, was not employed to operate and make use of the push-car and was guilty of willful misconduct in so doing; secondly, that if he was originally employed to operate the push-car, he was, at the time of his injury, operating the same in a manner that made his acts wholly without the course of his employment. The latter contention is that the conduct of Truman was not merely negligence in the operation of the push-car, within the scope of his employment, but was of such an exceptional and unusual nature as that it was really not related to the employment at all. Petitioner would concede that if Truman had been employed to use the push-car in furtherance of the employer's business and had used the push-car in the usual way and injury had resulted through some act of neglect on his part, the employer would be liable to compensate him under the Workmen's Compensation Act (Stats. 1917, p. 831). (*Great Western Power Co.* v. *Pillsbury,* 170 Cal. 180 [149 Pac. 35].)

While the testimony taken before the commission was brief and not particularly clear, it did cover the essential matters in a case of this kind.

It appeared that the petitioner, Standard Lumber Company, was engaged in the lumbering business in the county of Tuolumne. It operated the railroad mentioned in connection with that business. Respondent, Truman, and about forty other men were employed by petitioner in changing the rails of the railroad to rails of heavier weight. At one point on this railroad petitioner maintained a camp which the men left in the morning and to which they returned in the evening. They traveled on foot. The places of work were a considerable distance from the camp, and on leaving camp in the morning the men took their lunches with them. It was down hill from the places of work to the camp. It seems that, at least in some sections, there was a very considerable grade to the railroad. No map of the line of railroad showing grades or curves was introduced by petitioner or respondent. The employees worked in at least two crews. Burns was foreman of all the work and superintendent of all the employees. The respondent, Truman, was a subforeman, and in charge of the bending crew, the crew that bent the rails being laid. He was injured in the evening after quitting time. During the day he and his crew had been engaged in their work at a point somewhat more distant from camp than where the main body of workmen under the immediate control of Burns were working.

At or in the region of the camp, supplies would be obtained for use in the work which the men were engaged upon. There were two push-cars used along the line of the railroad where the work was going forward. The injured employee, Truman, stated in parts of his testimony facts from which it could be argued that one push-car was left in the control of his crew and that occasionally he and his crew used a push-car on returning to the camp in the evening for the purpose of bringing out, on the following morning, the lunches of the men or supplies needed in the doing of the work. His explanation as to the practice that prevailed as to such use of the push-car by the members of his own crew was very much qualified or practically nullified by other portions of his own testimony and by the testimony of other witnesses. Probably the only fair inferences to be deduced from the entire testimony was that the push-car in question was taken in from the work in the evening only in the event the foreman, Burns, directed this to be done; that

the car taken in would usually be in charge of a man by the name of Pete Shotelle; that the foreman would have the man last named and a special crew of three others, whose names are not given in the testimony, take in the car when the work was over at the end of the day in the event supplies were to be sent out from the camp the next morning; that this push-car was not used necessarily to bring out lunches for the men. As before stated, Truman's recollection of the circumstances of his injury was, according to the testimony, wholly destroyed. He repeatedly stated that he could not remember what transpired during the trip or during the period of about one-half hour prior to the time of the trip, on which he was injured. But the award does not depend on his testimony.

The petitioner contends that Truman had no business upon the push-car at the time of his injury, that he was not employed to operate the push-car, and that in fact before the push-car started on its journey Truman was told that the car was not to go in. This is petitioner's first point. Truman admitted, in one part of his testimony, that the particular car which was going into camp on the evening when he was injured probably started from the place where the men were working who were under the immediate supervision of Burns; that the crew under Truman had been working at a point farther along the railroad. The facts last mentioned were testified to moreover by other witnesses. So the issue was finally narrowed down to the question of Truman's authority to be upon or to use the push-car which was with the crew at work directly under Burns.

It appeared that Truman left his place of work and arrived at the point along the line of railroad where Burns was and where the push-car in question was. The men, Burns and Truman, were in speaking distance of each other. Certain witnesses testified specifically that they heard Burns say, "Men, take the car in." Burns and another witness contradicted this. Burns declared that he told Truman not to take the car in. Burns was superintendent, a vice-principal. He admits that it was Truman to whom he talked. The commission could believe him as to that. It could believe him in part and the other witnesses in part in arriving at the facts bearing on the issue of employment. Such is the privilege of a fact-finding tribunal. (*Starck* v. *Pacific*

*Electric Ry. Co.,* 172 Cal. 277, 281 [L. R. A. 1916E, 58, 156 Pac. 51].)

It was testified to, and not denied, that at least one of the men with the car at the time of the accident worked under the immediate supervision of Burns, that is to say, in what was described as "Burns' gang." It would not be unreasonable to assume that this Burns' man, so called, was in charge of the crew that took the car in. Neither side called any of these men. They had disappeared. Without question these men, including Truman, who was Burns' subordinate, "straw boss" as they called him, could rightfully obey Burns' command, although they might not have been the regular crew. Items of testimony tending to show that others than Burns' special crew took the push-cars to the camp when occasion for their use existed may be disregarded.

The commission, in view of the conflict in the testimony before it, could find that Truman was employed to take the car in.

Truman and three other men started to camp with the car after the command referred to; the testimony was that "it usually required . . . four men" to take the car in. At this time the brakes belonging to the car were not upon it. Before the commission Truman claimed that the company was to blame for failure to supply the car with brakes. The testimony showed that the push-car was a platform on four wheels. It evidently was similar to the low, flat car commonly used by section hands. Its brakes consisted of two pieces of timber. These would be set against the wheels to retard or stop the movement of the car. One witness testified that "there is two sticks and an opening in the platform, and you press that down." The men got on the car and, in going with it to the camp, it ran away and they were injured—Truman seriously. When Truman claimed before the commission that the car had no brakes Burns spoke up and stated that Truman or the men on the car had used his (Burns') "gauge" for a brake and broken it. It is not clear from the record what this gauge was, or how serviceable it might have been. The usual "brakes" were later found—it is not clear where, with respect to the starting point of the car. They had not been used on the trip. The men may have negligently failed to note the absence of

the brakes. They probably undertook to operate the car without using good brakes, but the record is not clear that the four men could not have taken the car to the camp without the usual brakes. The railroad was steep in places, but the grade was a railroad grade. Except as the men might be upon it, the car was not loaded. While there was testimony that a motor would be used to shove a loaded car up grade to the place of work, the testimony also showed that the car was not a large car, that it would hold but a few men. The car was so low that a man could readily step from it. If the men were negligent the commission could find their negligence was within their employment.

Petitioner earnestly contends that this was a "push-car," to be propelled by pushing; that the men were not supposed to get on the car; that the accident happened because they did get upon the car; that as a result they lost control of it, and that the car ran away down a steep grade and they were injured. The trouble with this argument is that the evidence does not show that the workmen never got upon the car in taking it on a trip of the length of a trip to camp. If there was no such practice it would not result that the commission could not infer and find that Truman's acts were but negligence within the scope of his employment. It is easy to infer and may be forcibly argued that these cars were ordinarily pushed about at the places of work in order to carry or distribute rails, supplies, and heavier tools used by the men. It is not easy to accept as conclusive the argument that men would always take the empty car on a long trip to camp without sitting upon it part of the time, particularly where the railroad grade appeared such as to permit of the practice without great risk. There was testimony that the men did ride on the push-cars which were being run into camp. So far as the method of construction is concerned, the car, as revealed by the evidence, was as simple as a car could be made; the method of braking it was primitive. It would seem the most unskilled person might have quickly learned to operate it. There is nothing in the evidence to indicate the necessity for having a special crew to handle it. And the claim that the men had no right or duty on the platform of the car is not persuasive in the light of the testimony that "there is two sticks and an opening in the platform, and you press that down." In the

absence of any better explanation in the record of the braking device, the conclusion is a fair one that a man must be on the platform of such a car to effectively manipulate these sticks through the "opening in the platform." Otherwise the car might speed beyond the reach of the man on the ground, before he could even have time to adjust the sticks in the "opening in the platform," or a sudden lurch of the car, if he were standing on the ground, might pull the brake ·sticks out of his hands. When Truman started on the trip he, according to Burns' testimony, was sitting on the car shoving with his feet. It was evidently difficult for the commission to understand Burns' failure to reprimand Truman or discharge him on the spot when he stated to Burns, "This is the way we go." It could well be urged that Burns' failure to say a word in reply to this remark showed, first, that it was likely that Truman was ordered to take the car in on the company's business, and, secondly, that he was not, at least, when and where the car was starting on its journey, doing an amazingly foolhardy thing in riding upon it. If the argument was not sound Burns, the man in authority, was allowing the company's property to be taken where it was not wanted, and from a place where it would be needed on the ensuing day. Evidently he was not worried over any great possibility of peril to Truman and the other three men. It appeared affirmatively that Truman had always been a faithful, reliable, and obedient employee. The terms or expressions, "course of employment" and "scope of authority," are referred to in 26 Cyc. 1533 and 1534. This very significant declaration is there made: "The purpose of the act rather than its method of performance is the test of scope of employment." Of course, the act of an employee, even though it was intended to forward the purpose of the employer, might be of such an exceptional and unusual nature as that a court would hold that it was not reasonably within the scope of the employment. Here the employee was using the very device he had been ordered to use; he was taking it into camp but was not careful in doing so.

If the injury occurs when the employee is performing an act entirely outside the employment no award may be made. (*Engels Copper Min. Co.* v. *Industrial Acc. Com.,* 183 Cal. 714 [11 A. L. R. 785, 192 Pac. 845].)

[1] Where two rational conclusions may be drawn from the evidence, one in favor of and one against the award made by the commission, the award may not be disturbed. (*Eastman Co.* v. *Industrial Acc. Com.*, 186 Cal. 587 [200 Pac. 17]; *Southern Pac. Co.* v. *Industrial Acc. Com.*, 177 Cal. 378 [170 Pac. 882].)

In the case next mentioned an award had been made by the commission in favor of one Coelho. He lost his life while employed as a deck-hand on a barge. He had nothing to do with the operation of the barge, but he and the other deck-hands were transported thereon from place to place where the barge was loaded and unloaded. Coelho exposed himself to a risk of falling from the barge by unnecessarily taking a position near its edge at a time when the waters of the estuary where the barge then was, was somewhat rough. One of the other deck-hands specifically warned him of his danger. He remained leaning against an upright near the edge of the barge. That was the last seen of him alive. His body was found in the water. When warned he did not go inside the cabin on the barge. That would have been the safe place for him to be, and there was evidence to show commands had been given to the deck-hands to be there. His body was found in the bay and no one testified as to exactly what occurred immediately preceding the accident. The record left that matter to inferences, as does the record here. The decision was by the supreme court in Bank and the remarks of the court have a bearing on the question of claimant's conduct: "Nor can we say that his position was so perilous that he displayed a spirit of bravado and reckless foolhardiness by occupying it. Taking the trip from San Francisco to Oakland on that barge so that upon arrival at the latter city he might be ready to assist in removing the cargo was a part of Coelho's duty. Therefore, he was in the course of his employment when the accident occurred if he was not either recklessly or in defiance of orders occupying a place of great peril. While his conduct was not careful and was not characterized by such caution as would be entirely commendable in one afloat upon such a craft, we cannot say that it amounted to willful misconduct. . . . As Coelho was going on his employer's business by the very conveyance furnished by the employer for that purpose, there can be no question of the

correctness of the finding that the accident occurred in the course of and arose out of his employment. (*In re Donovan,* 217 Mass. 76 [Ann. Cas. 1915C, 778, 104 N. E. 431].) " (*W. R. Rideout Co.* v. *Pillsbury,* 173 Cal. 132 [159 Pac. 435].)

[2] We think there was substantial evidence supporting the findings of the commission and that the award should be affirmed.

It is so ordered.

Burnett, J., and Finch, P. J., concurred.