[L. A. No. 7697.   In Bank.—December 21, 1923.]

ROYAL INDEMNITY COMPANY, Petitioner, v. INDUS-
TRIAL ACCIDENT COMMISSION et al., Respondents.

[1] WORKMEN'S COMPENSATION ACT—KILLING BY FELLOW-EMPLOYEE—
MOTIVE FOR—EVIDENCE.—Where an employer directed her chauf-
feur to accompany her downstairs in her residence to repel sus-
pected burglars and upon reaching a downstairs room a Chinese
cook, also in the employ of said employer, stepped from behind a
curtain in said room and shot and killed the chauffeur and im-
mediately thereafter went to his room and committed suicide, the
killing of the chauffeur being from motives of a private revenge
or for some other reason pertaining to him individually, the death
of the chauffeur did not arise out of his employment and was
not compensable under the Workmen's Compensation Act.

PROCEEDING in Certiorari to annul an award of the
Industrial Accident Commission.   Award annulled.

The facts are stated in the opinion of the court.

Willis I. Morrison for Petitioner.

Warren H. Pillsbury and Edward O. Allen for Respond-
ents.

WILBUR, C. J.—The Industrial Accident Commission
made an award in the above-entitled case after having first
decided the matter in favor of the employer and the in-
surance carrier, and after having granted a rehearing.   The
finding of the Commission in regard to the happening of the
injury is as follows:

"Said injury occurred in the following manner: Said
George R. Ingalls was employed as a chauffeur and imme-
diately prior to the injury was reporting to his employer on
the condition and expenses of operation of the employer's
automobiles in an upper room of her residence.   During such
report she heard suspicious noises in the lower part of the
house and asked him to investigate.   On second thought
she asked him to wait and she would accompany him, which
she did, taking with her a revolver, and upon reaching the
living-room the Chinese cook stepped from behind a curtain

in the dining-room and the employer said, 'Lim, you frightened me so, I thought there was a burglar,' whereupon said Chinese cook shot and killed said employee and thereafter immediately went to his own room and committed suicide. From the foregoing circumstances it is the conclusion of this Commission that the employee was exposed to the risk of this particular injury by the request of his employer to protect her and her property from possible marauders and that said Chinese cook was at said time such a marauder, although his specific purpose in appearing armed at that time and place is unknown and that said injury, therefore, also arose out of said employment and was proximately caused thereby."

In addition to the foregoing statement of facts it may be added that the Chinese cook had been employed by Mrs. Garvey for two years and that the deceased had also been employed for about ten months and that they were well acquainted and apparently friendly. There is no showing of any trouble between them except that there was evidence that about six weeks or two months previous to the killing the deceased had been skylarking with the cook, and in the course of the skylarking the cook had been somewhat bruised and had been shut in a closet. Apparently after that time the relations between the two had been friendly. There was also evidence that Mrs. Garvey, the employer, first saw the cook as he came out from behind the curtains immediately before he shot the deceased. She noticed a very peculiar wild look on his face. Nevertheless, she was satisfied and turned away and "gave it no more thought." Two shots were immediately fired by the Chinese cook in killing the deceased. The Chinaman then repaired to his room and killed himself with the same weapon.

Under these circumstances it is clear that the Chinaman intended to kill the deceased, and that he had no intention of killing his employer or molesting her property.

[1] Assuming that the direction by the employer to the chauffeur to accompany her downstairs to repel suspected burglars brought the transaction within the course of his employment, so that if he had been killed or wounded in preventing a burglary, the injury would have been compensable, because arising out of his employment, it is clear that the death of the deceased did not arise out of such em-

ployment, but that he was killed from motives of a private revenge or for some other reason pertaining to him individually and not arising out of the employment. The employer would never have directed the deceased to accompany her for the purpose of overcoming the Chinese cook, and, immediately upon discovering his presence, she was satisfied that their errand had been unnecessary and fruitless. Neither the employer nor the deceased anticipated the tragedy which immediately followed. The award must be annulled.

In view of our conclusion, it is unnecessary to pass upon the question raised by the petitioner, Royal Indemnity Company, which claims that the award was unauthorized because of the fact that the notice of the application for rehearing after the first finding of the Commission was not served upon it, and that for that reason the Industrial Accident Commission had no jurisdiction to vacate the original decision and make the award.

Award annulled.

Kerrigan, J., Myers, J., and Waste, J., concurred.

LAWLOR, J., Dissenting.—I dissent.

The majority opinion assumes that the killing occurred in the course of the employment, and I cannot escape the conclusion that it also arose out of it. When the deceased started down the stairs it cannot be doubted that his mission continued until the occasion of · the suspicious noise was ascertained and the situation dealt with. The discovery and the killing were simultaneous. In such an undertaking how can it be held that both elements of the employment did not concur with the shooting? It is apparently conceded that if a burglar, and not Lim Foon, had caused the killing it would have been compensable. In my view, under the evidence, no clear reason appears why the injury is not compensable because it was inflicted by Lim Foon.

The risk of the employment continued up to the time of the shooting. According to the other view the risk ceased with the discovery of Lim Foon, and from that moment the deceased would be without the protection of his employment. He came to the spot where he lost his life upon the express direction of Mrs. Garvey. That she realized he was entering upon a dangerous expedition is evidenced by the circum-

stances that she armed herself and accompanied him to what
proved to be his death.  As I have pointed out, the risk of
the employment attached when the mission was entered upon
and continued until it ended.  Meeting the situation as it
arose was a part of the undertaking, and what actually oc-
curred when the occasion for the noise was discovered was
just as much a part thereof as the investigation itself.  The
deceased exercised no volition in obeying Mrs. Garvey's di-
rection; he simply complied with her orders, and in such
circumstances the risk of the employment is as broad as the
service rendered.  The service rendered in this case is the
proximate cause of the killing.

The majority opinion reasons that "Under these circum-
stances it is clear that the Chinaman intended to kill the de-
ceased, and that he had no intention of killing his employer
or molesting her property." . This conclusion necessarily in-
volves a pure question of fact which it is exclusively within
the province of the Commission to decide.  The rule has
been declared that "This court, in reviewing awards of the
Commission, is not acting as a court of appeal.  It has no
power to weigh the effect of positive evidence.  It must
assume that the Commission believed all the evidence given
which tends to sustain the award made."  (*Southern Pac. Co.*
v. *Industrial Acc. Com.*, 177 Cal. 378 [170 Pac. 822]).

According to Mrs. Garvey she knew nothing of a feud
between the deceased and Lim Foon, notwithstanding she wit-
nessed the scuffle which she testified appeared to be friendly,
*and in which another chauffeur of the family took part.*
Mrs. Garvey testified she thought he blamed the other chauf-
feur, who picked him up and put him in the closet.  The
deceased merely stood by while this was being done.  In view
of this evidence is this court to decide against which one of
the chauffeurs, if either, Lim Foon nursed a grievance?  He
had been with the family for two years, was "a model
servant," "very quiet and gentlemanly" and "absolutely
trustworthy."  The scuffling occurred six weeks or two
months before the shooting, and that incident is the only
reason suggested for any animosity on on the part of Lim
Foon.  Moreover, there is evidence that on the morning pre-
ceding the killing he exhibited a friendly spirit toward the
deceased.  But Lim Foon's action may have been inspired
by causes entirely independent of the deceased.  The house-

keeper testified that when Lim Foon was leaving the house that morning, in answer to her usual injunction, "Lim, be a good boy," "he looked at me kind of funny and said, 'I am not going to be a good boy, I am going to be bad.' He came back and said goodby to Mr. Garvey and me and I walked to the door with him and said, 'Lim, at least try and be a good boy or we'll have to send you to Sunday-school." He went off laughing. I called to him from the window and said, 'Goodby, Lim, be good.'" This was his day off and he left at 10:45 A. M. It was his custom to return early in the evening. The gardener testified the deceased entered the house from the garage from ten to fifteen minutes before the shooting, and that, returning from downtown, Lim Foon followed him into the house from five to seven minutes later. It would appear from the evidence that Lim Foon was not aware the deceased had preceded him into the house. He urged his employer to go out riding that afternoon, which was an unusual suggestion for him to make. It is in evidence that Mrs. Garvey did not expect to find him in the house at the hour in question. Respondents argue that the strange look on his countenance at the time of the shooting might not be due to an intention to kill, but to some other wrongful act in the contemplation or execution of which he was interrupted. It was also suggested the act of killing may have been due to insanity, but this, like the other theories, is found by the Commission to be purely conjectural.

Notwithstanding the finding of the Commission that the specific purpose of Lim Foon appearing armed is unknown, the main opinion assumes to decide that precise question of fact by holding that he killed the deceased either "from motives of a private revenge or for some other reason pertaining to him individually." This, it seems plain, is invading the province of the Commission and determining a question of fact which it was unable to decide. The Commission no doubt took into account the circumstance that Lim Foon appeared friendly to the deceased on that morning. If the Commission, with the witnesses before it, could not discover the motive for his action this court could hardly solve the question of fact. In all probability it can never be satisfactorily determined. The question of motive or want of it is hopelessly involved in conjecture and is be-

yond the finite mind to solve. If Lim Foon suddenly became insane the law would not impute a motive to him. Nor do I find warrant for the further statement in the majority opinion as to what Mrs. Garvey would have done if she had known Lim Foon caused the suspicious noise, or that, discovering his presence, she was satisfied the errand was unnecessary or fruitless.

In my opinion a *prima facie* case was made out by the claimants and the award should therefore be affirmed.

All the Justices concurred, except Lawlor, J., who dissented.

Rehearing denied.