[Civ. No. 5749. Second Appellate District, Division One.—December 7, 1927.]

ADDA N. SINGLAUB, Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION and THE FISH AND GAME COMMISSION, Respondents.

Frank C. Scherrer for Petitioner.

G. C. Faulkner, Frank J. Creede and Henry G. Sanford for Respondents.

HOUSER, J.—From the evidence submitted to the respondent Commission on the hearing of an application before it for adjustment of a claim for compensation arising from the death of an employee named John J. Singlaub, the general finding was made that ''the evidence does not establish that the employee's death was proximately caused by an injury arising out of the employment.'' Based upon such finding, it was ordered that the applicant ''take nothing from defendants, . . . ''

On the ground that in making such finding and award the respondent Commission acted without and in excess of its powers, petitioner prays that such finding and award be annulled by this court.

It appears that Mr. Singlaub was employed as a working foreman in a fish hatchery. He died from a cerebral hemorrhage or what is commonly known as a stroke of apoplexy. According to the testimony of the applicant, who was the widow of the employee, at about 3 o'clock P. M. of No-

vember 11, 1926, she went to the hatchery where her husband was employed and found that the water used therein was not running properly. Shortly thereafter her husband, "dripping with perspiration and breathing very hard," came into the hatchery. Within a short time following the appearance of Mr. Singlaub at the hatchery, he seemed to be "all right." Prior to that time, with the exception of a cold which he contracted in January or February of the same year, the employee was in a most healthy condition. The superintendent of the hatchery testified that in the afternoon of November 11, 1926, the employee was engaged in cleaning dams and intake lines which supplied water for the hatchery. In order to do such work properly, the employee should have turned off the hatchery water supply and turned the domestic water supply into the hatchery supply lines. About an hour before the employee had the fatal seizure he made a mistake in connection with the turning of a valve, with the result that the domestic water supply was also turned off. On noticing that the water supply was cut off, the superintendent sent a man to get a valve key from the employee so that the water might again be turned into the hatchery. At that time the employee was working at a place approximately 250 to 300 yards from the hatchery. The key was about three and a half or four feet in length, made of iron, and weighed about twenty-one pounds. On being informed that the key was wanted at the hatchery, the employee returned thereto, "walking pretty fast." He carried the key with him. Under ordinary circumstances, in returning to the hatchery, instead of walking, he would have driven thereto in an automobile truck which was available to him at the time. On arriving at the hatchery the employee "appeared to be normal and about the same as usual." The superintendent showed him where he had made the mistake in turning the valve and then turned the water in properly, after which the man who had been sent to get the valve key, the superintendent, and the employee went into the hatchery, watched the water come in, and "stayed there talking perhaps ten minutes"—at which time the superintendent noticed that the water "was running a little muddy," and thereupon inquired of the employee the cause thereof, who informed the superintendent that "they had turned it in from the

line and had not finished cleaning it up there"; whereupon the superintendent told the employee that "he had better shut the water off." The employee then returned to the intake, carrying the valve key with him. Probably half an hour later the men with whom the employee was working brought him in an automobile back to the hatchery. At that time he sat in the automobile with "a blank stare in his eyes and a kind of grin-like on his face; he said nothing. . . . He had his pipe hanging loose in his mouth, but he did not appear to be making any motion or movement at all." A doctor testified that cerebral hemorrhage was the cause of the death of the employee; that a few months prior to his decease the witness had examined him and had found that "the radial arteries were palpable at that time; . . . that not more than twenty or twenty-five per cent of the cases of cerebral hemorrhage occur following exertion; many of these accidents occur during sleep and when the subject is absolutely at rest; so physical exertion is only a factor in the production of these things, caused by disease of the radial arteries; . . . if there had been a bullet fired through this man's brain you would know it had been the direct cause of his death, but in this case it is impossible to know what was or would have been under other circumstances inside of this man's skull, . . . "; that he believed that the cerebral hemorrhage suffered by the employee "was caused from the fact that he over-exerted himself at that time." However, that "it would only be a guess" whether the cerebral hemorrhage was caused by overexertion, or by anger, or from overeating, or by any one of other numerous causes; that although if there had been a rupture of a small artery in the brain, the resulting hemorrhage might continue for several hours before the blood clot from the hemorrhage would become large enough to cause a collapse,—because of the fact that the employee died soon after the seizure, the indications were that the rupture was in a "fair sized vessel"; that after the rupture of the artery in the brain and before the collapse would occur the pressure would have some tendency to render the subject "muddled" or confused. Another witness testified in substance that after the employee had returned from the hatchery to the intake, he noticed the employee "staggering a little bit, and he staggered there a little while, and

he kept getting worse and he started to fall," but was then supported and cared for by the witness and another man until he was taken by them in an automobile back to the hatchery.

It is unquestioned law that where the death of an employee may be traced to two causes, first, to that of a primary disease, and secondly, to overexertion in the work in behalf of his employer in which the employee is engaged at the time of his death, the employer or his insurer is liable. In other words, notwithstanding the previous diseased condition of the employee and in the natural consequence of which the inevitable death of the employee will ensue, if satisfactorily established that the demise of the employee, though primarily caused by his idiopathic condition, nevertheless was superinduced by overexertion of the employee arising out of his employment, the liability of the employer is fixed. As is said in *Eastman Co.* v. *Industrial Acc. Com.*, 186 Cal. 587, 594 [200 Pac. 17] : "If the disability, although arising from a chronic heart trouble, was brought on by any strain or excitement incident to the employment, the industrial liability still exists. Acceleration or aggravation of the pre-existing disease is an injury in the occupation causing the acceleration. (Citing cases.) "

In the case of *Knock* v. *Industrial Acc. Com.*, 200 Cal. 456 [253 Pac. 712], the case of *Patrick* v. *Ham Co.*, 119 Me. 510 [13 A. L. R. 427, 111 Atl. 912], is cited with approval. In the latter case it is held that, although, as in the instant case, the employee may have been predisposed to cerebral hemorrhages, and that he might have died therefrom "within a week or a year," nevertheless if the seizure which caused his death occurred while the employee was directly engaged in an overexertion which was required by his employment, the industrial liability of his employer existed.

In the Knock case, 200 Cal. 456 [253 Pac. 712], the employer was held liable for the death of an employee primarily caused by directing the employee to work at an altitude higher than that to which he had been accustomed in his regular employment.

On the other hand, the principle seems to be firmly established that, notwithstanding the fact that in the course of

his employment death may occur to the employee, if it appear that it was caused solely from a disease with which the employee was afflicted, the injury sustained by his dependents on account of the death of the employee is not compensable. In that connection the language appearing in the case of *Eastman Co.* v. *Industrial Acc. Com.*, 186 Cal. 587, 594 [200 Pac. 17], is pertinent. It is as follows: "Where, however, the proximate and immediate cause of the injury is from disability arising solely from an idiopathic or subjective condition, the weight of authority, including the decisions of this state, are against recovery, though the injury clearly occurs in the course of employment. (Citing cases.)"

The law, then, appears to be well settled. The difficulty encountered in the correct determination of a given case depends primarily upon the facts as determined by the tribunal before which the proceeding is heard. In the instant case, with reference to the cause of death, the finding by the respondent Commission was that the evidence does not establish that the employee's death was proximately caused by an injury arising out of the employment. As a somewhat reduced statement of the salient facts adduced on the hearing before the respondent Commission, it appears that the only possible "overexertion" of the employee in connection with his work consisted in the walking "pretty fast" and the carrying by him of a 21-pound iron key for a distance of from 250 to 300 yards. That whatever immediate effect was produced by such possibly unusual physical exertion was of no material consequence is manifested by the fact, as testified to by the widow of deceased, that shortly thereafter he appeared to be "all right"; also (by the superintendent) that on arriving at the hatchery, the employee "appeared to be normal and about the same as usual." The additional facts that for a space of ten minutes following the incident in question he remained within the hatchery, during which time he watched the operation of the water which had been turned into the hatchery and conversed generally with the superintendent and one of his fellow-employees; and, upon being requested to do so by the superintendent, the employee walked the 250 or 300 yards back to his work and there resumed his usual and ordinary labor before any manifestation of the

fatal attack was noticeable,—would tend to establish the correctness of the conclusion reached by the respondent Commission, which is the subject of the petitioner's attack. With the exception of the hardened arteries of the employee, the evidence is replete with testimony of his good health, his former powers of endurance, and his general physical condition. When the well-known fact is considered that an infantryman in the U. S. Army, on an all-day march in time of war, is required to walk rapidly and at the same time to carry as ordinary equipment arms and baggage aggregating 57 pounds, the fact that in the instant case an employee accustomed to outdoor labor should be required to carry a 21-pound key for a distance of only 250 to 300 yards would seem negligible as a factor in demonstrating or illustrating any actual "overexertion." The only evidence before the respondent Commission which in any way would authorize a finding to the effect that the death of the employee was proximately caused by an accident arising out of his employment was that contained in the testimony of the physician who, with some hesitancy and qualification, stated in substance that he believed that "this cerebral hemorrhage was caused from the fact that he [the employee] overexerted himself at that time." The further testimony of the physician shows that from clinical observations it is shown that not more than twenty or twenty-five per cent of the cases of cerebral hemorrhage occur following exertion, and that *"it would only be a guess . . . to* determine whether a cerebral hemorrhage occurring as in the present instance is caused by overexertion, or any of the numerous causes that might cause high blood pressure."

A rule, which is beyond question either in its soundness or in its legal establishment, is that a finding by any tribunal having jurisdiction, based upon substantial evidence, is final and conclusive. (*Southern Pacific Co.* v. *Industrial Acc. Com.*, 177 Cal. 378, 380 [170 Pac. 822]; *Dearborn* v. *Industrial Acc. Com.*, 187 Cal. 591, 594 [203 Pac. 112]; *Tartar* v. *Industrial Acc. Com.*, 191 Cal. 703, 704 [218 Pac. 39]; *Royal Indemnity Co.* v. *Industrial Acc. Com.*, 192 Cal. 675, 678 [221 Pac. 371]; *Western Pacific R. R. Co.* v. *Industrial Acc. Com.*, 193 Cal. 413, 417 [224 Pac. 754]; *Stacey Bros. Co.* v. *Industrial Acc. Com.*, 197 Cal. 164, 169 [239 Pac. 1072]; *Standard L. Co.* v. *Industrial Acc. Com.*,

60 Cal. App. 331, 338 [212 Pac. 720]; *Royal Indemnity Co.* v. *Industrial Acc. Com.*, 70 Cal. App. 435, 436 [233 Pac. 381].) It should therefore be remembered that if the conclusion on the facts rendered by the respondent Commission was supported by any competent evidence, this court is powerless to interfere. Considering that immediately following the claimed "overexertion" of the employee, and for some time thereafter, he appeared to be "all right"; that he was "normal and about the same as usual" and that he resumed his ordinary labor before the fatal seizure was experienced by him; together with the positive testimony of the physician that not more than twenty to twenty-five per cent of cerebral hemorrhages occur following exertion,—it is clear that in arriving at the conclusion that the evidence did not establish that the death of the employee was proximately caused by an injury arising out of the employment, the respondent Commission was acting in accordance with an inference deducible from the evidence. Although to have decided otherwise the Commission would have been obliged to act as against seventy-five or eighty per cent of "clinical observations," as testified by the physician, from a legal standpoint it is not impossible that such a conclusion would likewise have found support in the evidence. The authorities are numerous which indicate that the burden of showing causal connection between the death of the employee and the work performed by him rests with the applicant for adjustment of compensation. In 27 Cal. Jur., page 488, section 156, it is said: "It devolves upon a claimant seeking compensation to establish the fact that the injury which caused disability or death arose out of and in the course of the injured person's employment, by evidence from which such a conclusion is fairly inferable."

See, also, *Casualty Co. of America* v. *Industrial Acc. Com.*, 176 Cal. 530 [169 Pac. 76]; *Employers' Liability Assur. Corp.* v. *Industrial Acc. Com.*, 182 Cal. 612 [187 Pac. 42]; *Eastman* v. *Industrial Acc. Com.*, 186 Cal. 587 [200 Pac. 17]; *Simpson C. Co.* v. *Industrial Acc. Com.*, 74 Cal. App. 239, 245 [240 Pac. 58].

To again use the language of the learned physician-witness in the instant case, the most that can be said for the

opinion, that the proximate cause of the death of the employee was his "overexertion" in the course of his employment, "would only be a guess." As is aptly stated in the opinion in the case of *United States Fuel Co.* v. *Industrial Com.*, 310 Ill. 87 [141 N. E. 402] : " . . . Before a claimant can recover compensation, he must prove by a preponderance of competent evidence that the injury arose out of and in the course of his employment. Liability under the Compensation Act cannot rest upon imagination, speculation, or conjecture—upon a choice between two views equally compatible with the evidence—but must be based upon facts established by a preponderance of the evidence. (Citing cases.) "

And in *William Simpson C. Co.* v. *Industrial Acc. Com.*, 74 Cal. App. 239 [240 Pac. 58], it is held that where the evidence is such that any opinion as to the proximate cause of the death of an employee is a mere surmise and conjecture, and not based upon any foundation sufficient to support a finding of fact, an award in favor of the dependents of the employee must be annulled.

Furthermore, it will be remembered that before the employee carried the 21-pound key for the distance of 250 to 300 yards he had made two mistakes in work in which he was very familiar, to wit, in turning separate water valves; and when requested to return with the valve key from the intake to the hatchery, instead of using an automobile which was available to him, he had chosen to walk the distance of 250 to 300 yards and to carry the key with him. Such facts, in connection with the testimony of the physician to the effect that after a rupture of a small artery in the brain the resultant hemorrhage may continue for a period of several hours before the volume of blood becomes large enough to cause a collapse, may have caused the respondent Commission to reach the conclusion that the reason for the irregular conduct and mistakes made by the employee before he carried the 21-pound key was that the rupture had already occurred, with the result that his mind was "muddled" and not quite normal.

As a conclusion from the facts and law applicable to the instant case, it is manifest that the evidence adduced before the respondent Commission justified the finding of

fact of which complaint is made, and that such finding is conclusive in the premises.

The award is affirmed.

Conrey, P. J., and York, J., concurred.