[Civ. No. 11118. First Appellate District, Division One.—February 28, 1941.]

HATTIE NAUGHTON, Respondent, v. RETIREMENT BOARD OF SAN FRANCISCO et al., Appellants.

John J. O'Toole, City Attorney, and Reynald J. Bianchi, Deputy City Attorney, for Appellants.

James C. Purcell and William E. Ferriter for Respondent.

KNIGHT, J.—Thomas Naughton, a member of the San Francisco Police Department for twenty-nine years, died June 7, 1937. At the time of his death he held the rank of sergeant. He was survived by his wife, Hattie Naughton, to whom he had been married nearly thirty years. She filed application with the Retirement Board of San Francisco, City Employees' Retirement System, for a pension; and after hearing the evidence the board denied her application. Thereafter she petitioned the superior court for and was granted a peremptory writ of mandate directing the board to award the pension. From the judgment entered therein the board has appealed.

Subdivision (c) of section 166 of the present city charter relating to police pensions is a re-enactment of section 4, chapter IX, article VIII of the preceding charter, and in construing the latter it has been held in effect that where an officer dies as a result of a pre-existing disease of the heart and it is established that the disease has been aggravated and death accelerated or precipitated by exertion in performing the duties of his office, the case falls within the scope of said charter provision, and his widow is entitled to the benefits granted thereby. (*Buckley* v. *Roche,* 214 Cal. 241 [4 Pac. (2d) 929].)

Naughton died from a progressive type of heart disease known as coronary sclerosis and myocardial infarction, with which he had been afflicted for several years; and because of his impaired state of health and at his request he had been for more than two and a half years prior to May 24, 1937, assigned to inside duties at district station headquarters. On the date mentioned, however, which it will be noted was two weeks prior to his death, as a result of police reorganization he was transferred to another station and assigned to patrol duty, most of which he was required to do on foot; and he continued to fill that assignment up to the time of his death. After reporting off duty at the station at midnight on June 6th, he visited the home of an old friend, where he died; and Mrs. Naughton's application for pension was based upon the claim that the disease from which her husband died was aggravated and that his death was accelerated by over-exertion in attempting to perform the foot patrol duties to which he had been assigned two weeks prior to his death.

The evidence before the board consisted entirely of that produced by Mrs. Naughton, no testimony having been introduced in opposition thereto by the board; and in her petition for the writ she alleged that such evidence was free from conflict. In its answer to the petition the board expressly admitted the truth of that allegation; and at the opening of the trial counsel for the board stated to the court that the question to be determined was whether the denial of the pension by the board constituted an abuse of discretion. Therefore the proceeding was heard and determined on a transcript of the evidence taken before the board; and the court found therefrom that in denying the application for the pension the board acted arbitrarily and clearly in

abuse of its discretion. In a supplemental brief the
board has raised the point that *mandamus* is not the proper
remedy, and that *certiorari* only will lie. The following
cases are authority for holding, however, that the remedy
of *mandamus* is available where it is alleged and shown that
the local board has acted arbitrarily and clearly in abuse of
its discretion: *Buckley* v. *Roche, supra; Peters* v. *Sacramento
City E. R. System,* 27 Cal. App. (2d) 10 [80 Pac. (2d) 179];
*McColgan* v. *Board of Police Commrs.,* 130 Cal. App. 66 [19
Pac. (2d) 815]; *Mogan* v. *Board of Police Commrs.,* 100 Cal.
App. 270 [279 Pac. 1080]. Appellants cite the case of
*Nider* v. *City Commission,* 36 Cal. App. (2d) 14 [97 Pac.
(2d) 293]; however, no reference whatever is made therein
to the cases above cited, and it would seem, therefore, that
in deciding that particular case the court did not intend
to establish any doctrine contrary to that adhered to in the
preceding cases.

In the present case the principal facts established before
the board, as they are disclosed by the transcript, may be
stated as follows: In 1934, after completing an assignment
to ''strike'' duty on the waterfront, Naughton complained of
illness. He was short of breath, complained of pains in
his chest, and he was subject to violent coughing spells dur-
ing which he would choke and turn blue in the face. In
October, 1934, at his request and on account of his condition
of health he was assigned to desk work at the Western Addi-
tion station, and later at the Stanyan Street station. While
filling those assignments his impaired physical condition was
clearly noticeable to some of his fellow officers. On May 24,
1937, a police reorganization took place, and he was trans-
ferred from inside work to patrol duty, with headquarters
at the Golden Gate Park station at 37th Avenue and Fulton
Street. The district covered a large area, with many steep
hills. With the exception of a small part of the Sunset
district, it embraced those portions of the city from the
Golden Gate on the north to the south boundary line of the
city, lying west from 29th Avenue to the ocean, including
all of Golden Gate Park, the Legion of Honor, the Veterans'
Hospital, Fleishacker Pool and Playground, and all of the
beach. As sergeant of the district he was required, during
an eight-hour watch, to visit officers patrolling the district,
and to ring in from police boxes located in various parts
of the district. Eight of the fourteen days he was attached

to the Golden Gate Park station he was assigned to the radio car or acted as lieutenant inside the station, but the other six days he served on foot patrol. That is to say, on May 25th, 27th and June 6th he served on foot patrol from 4 o'clock in the afternoon until midnight, and on May 31st, June 1st and 2d from midnight to 8 A. M. On the 4 o'clock to midnight watches he reported at the station for duty at 4 o'clock, then rang in from six different boxes in the district, located on both sides of and in the park. He rang in from the first box at 5:30, and every hour thereafter from a different box, the last being at 10:30, and at 12 he reported back to the station and went off duty. On the midnight to 8 A. M. watches he followed the same procedure, reporting on duty at the station at 12, and off duty at 8, and ringing in from various boxes hourly from 1:30 to 6:30 inclusive. It was demonstrated by the location of these various boxes, and the court found, that he crossed the park four times and walked a distance of four to six miles each of the times he was on foot patrol, except the last, June 6th, when he crossed the park twice. The rules of the department permitted him to use street cars, but all the evidence was to the effect that because of the poor transportation facilities available to him he made the beat on foot. In this regard it appears that the street car service was inextensive and the cars ran infrequently; that the only means of transportation across the park was a bus line at 10th Avenue which stopped at 12:30 A. M.; furthermore, that there were no transportation facilities along the beach. According to the testimony given by his widow, he made the beat on foot, and testimony was given by other officers that whenever they saw him on the beat he was on foot.

During the two weeks he was stationed at the Golden Gate Park station he complained to his wife and others that his beat was too hard for him—that he could not stand the walking; and in this connection Mrs. Naughton testified that his general health was not at all good during that time; that he was tired all the time, "very bluish in the face whenever he had coughing spells", and was unable to sleep on account of pains in his chest. On June 5th he reported for work at 11 P. M. and worked until 7 A. M. on June 6th, as acting lieutenant in the station. At about 3 A. M. he had a violent attack of coughing while walking across the floor of the assembly room. It was witnessed by other of-

ficers, one of whom testified that Naughton choked and gasped for breath for nearly a minute. Later that morning (Sunday, June 6th) at his home he rubbed his chest with some medication, and he complained to his wife of severe pains in his chest, around his heart, stating he had nearly "passed out" while on duty. She asked him if he wanted a doctor, but he said he thought he would be all right. She also suggested that he ask to be assigned to inside work, but he said he was going on his vacation soon and would do so when he came back. He went to bed and remained there until about 1 o'clock in the afternoon, when he got up, had a little tea, and was driven back to the station at 4 o'clock by his brother-in-law, to report for foot patrol duty. On his arrival at the station he complained to several officers about not feeling well, and about 5 o'clock two of the officers, who had witnessed the coughing seizure the night before, drove him in a radio car to a drug store where the druggist gave him some medicine to relieve the pain in his chest. He then continued on foot patrol duty, and at 5:30 rang in from the box at the Museum in the park—about 10th Avenue; at 6:30 he rang in from 30th Avenue and Balboa; at 7:30 from Balboa and La Playa (the beach); at 8:30 he was at the police station; at 9:30 he rang in from 37th Avenue and Geary; at 10:30 from 48th Avenue and Judah (across the park); and about 11:15 he went back to the station. One of the officers asked him if he felt any better, but he said not very much; that the medicine he had taken at the drug store had relieved him somewhat, but not to any great extent. At midnight he reported off duty, and went to the home of a friend named Lansfield, on Eddy Street between Buchanan and Webster, as he had done before on frequent occasions after having reported off duty at midnight. He had known Lansfield for some twenty-five years; and when he arrived at Lansfield's home he complained of distress from gas. To relieve him Lansfield and his wife gave him some soda, and a hot "toddy" consisting of lemon, whiskey and water. Soon afterwards Lansfield went to bed, leaving Naughton sitting in a chair near the radio. Mrs. Lansfield remained up to see that Naughton caught a street car at 2:10 to go home, but she went into another room to lie down on the couch and fell asleep. The next morning when Lansfield arose he found Naughton lying on the floor, dead.

An autopsy was performed by Dr. Sherman Leland, the chief surgeon to the coroner, and the death certificate signed by him gave the cause of death as "coronary sclerosis, myocardial infarcation and failure"; and the only medical testimony given before the board was that of Dr. Leland, to the effect that the decedent's heart had been in bad condition for some time—that it was "just enough to carry him along", and that the extra load put on it by the walking he was required to do when put on foot patrol after having done inside work for some time was obviously harmful; and when asked the question as to whether that would result in shortening a man's life, he answered "Certainly".

We are of the opinion that in view of the foregoing uncontradicted evidence, the case was brought within the doctrine of such cases as *Buckley* v. *Roche, supra,* and *Peters* v. *Sacramento City E. R. System, supra,* and that therefore the trial court was justified in finding that the board in denying the application for pension acted arbitrarily and clearly in an abuse of its discretion. Two of the principal cases upon which the court rested its decision in the Buckley case arose under the Workmen's Compensation Act. One was *George L. Eastman Co.* v. *Industrial Acc. Com.,* 186 Cal. 587 [200 Pac. 17], and the other *Fogarty* v. *Dept. of Industrial Relations,* 206 Cal. 102 [273 Pac. 791], which in turn stresses the case of *Singlaub* v. *Industrial Acc. Com.,* 87 Cal. App. 324 [262 Pac. 411]. In the Singlaub case the court said: "It is unquestioned law that where the death of an employee may be traced to two causes, first, to that of a primary disease, and secondly, to overexertion in the work in behalf of his employer in which the employee is engaged at the time of his death, the employer or his insurer is liable. In other words, notwithstanding the previous diseased condition of the employee and in the natural consequence of which the inevitable death of the employee will ensue, if satisfactorily established that the demise of the employee, though primarily caused by his idiopathic condition, nevertheless was superinduced by overexertion of the employee arising out of his employment, the liability of the employer is fixed." And in the Eastman case the language of the court was: "If the disability, although arising from a chronic heart trouble, was brought on by any strain or excitement incident to the employment, the industrial liability still exists. Acceleration or aggravation of a pre-existing disease is an

injury in the occupation causing such acceleration.'' Another case holding to the same effect, and which is also emphasized by the court in the Buckley case, is *Knock* v. *Industrial Acc. Com.*, 200 Cal. 456 [253 Pac. 712].

The board contends that in the exercise of its discretion it was warranted in finding that the heart failure was precipitated by some strain other than that occasioned by walking the beat. But there is no evidence upon which such a finding could be based. To the contrary, it shows without contradiction that death was accelerated by the amount of walking the decedent was required to do on foot patrol duty, after being transferred to the Golden Gate Park station. As held in *Peters* v. *Sacramento City E. R. System, supra,* in dealing with a similar situation, wherein the same contention was made, '' . . . there being no substantial evidence to support the conclusion reached by the retirement board, it had no facts upon which to base the conclusion reached, hence it exercised no discretion, and having acted contrary to the undisputed facts its act is treated and considered as arbitrary.'' (See, also, *Buckley* v. *Roche, supra.*) Stated another way, the board's negative finding must be based on something more than mere conjecture.

The board points out that the death certificate contains the recital: ''Death due to natural causes''; and it contends that therefore the certificate alone is sufficient to sustain its decision, citing *Bennett* v. *Brady,* 17 Cal. App. (2d) 114 [61 Pac. (2d) 530]). But in the light of the testimony given by Dr. Leland, by whom the entry was made, from which it appears that the walking the decedent was required to do in performing his foot patrol duties hastened his death, the only significance that can be attached to the recital above quoted is that the decedent's demise was not brought about by violence or accidental means. The case of *Bennett* v. *Brady, supra,* is not in point, for there a sharp conflict was presented between the testimony of two medical experts as to whether the exertion to which the officer had been subjected hastened his death; whereas here there was but one medical expert, from whose uncontradicted testimony it appears that the officer's life was shortened by over-exertion in performing his duties. Nor can it be successfully maintained that the doctor was misled by or that any prejudice resulted from any inaccuracies in the hypothetical question put to him. Before he answered the question he asked,

" . . . that is of course considering all the facts I have brought out here", showing that he had well in mind all the circumstances when he gave his answer.

In the board's reply brief, much is said about the circumstances under which the decedent died. In this connection our attention has been called to the admission of Lansfield that he "used to bootleg", and while so engaged assumed the name of Baker; also to the fact that an analysis was made of the decedent's stomach which disclosed the presence of "two-tenths of one per cent" ethyl alcohol; and it is intimated, although there is no testimony whatever so showing, that when Lansfield retired he left a bottle of whiskey at the decedent's disposal; and it seems to be contended that those were the factors which precipitated Naughton's death, rather than over-exertion in the performance of his duties. It is obvious, however, that Lansfield's former activities can have no bearing on the question at issue; nor can it be said that there was anything unusual about Naughton's visit that night, because, as the evidence shows, they had been friends for many years, and frequently, after reporting off police duty, he visited Lansfield before going home. With respect to the presence of alcohol in the decedent's stomach, Dr. Leland testified that "You certainly would not be intoxicated" by the amount there found. In fact there is no testimony whatever from which it may be inferred that the decedent indulged freely in liquor, or even that he was an habitual user thereof. It will be seen, therefore, that there is nothing in the circumstances surrounding the death of Naughton which can serve as ground for denying his widow's claim for pension.

The judgment is affirmed.

Ward, J., concurred.

PETERS, P. J., Concurring.—I concur in the judgment.

So far as the question of remedy is concerned, I believe that either *mandamus* or *certiorari* will lie to "review" the determinations of local boards exercising judicial or *quasi* judicial powers. If *certiorari* is used, the extent of the review would be to inquire into the "jurisdiction" of the local board. So far as the evidence is concerned, that would mean that the superior court's power is limited to determining whether there is any substantial evidence to support the

findings of the board. If *mandamus* is used, the extent of the ''review'' is to determine, as pointed out in the main opinion, whether ''the local board has acted arbitrarily and clearly in abuse of its discretion.'' So far as the evidence is concerned, that means that the superior court's power is limited to determining whether there is any substantial evidence to support the findings of the board. There is no doubt that the cases hold, as stated in the main opinion, that *mandamus* may be used by the aggrieved party. Whichever remedy is used, so far as the evidence is concerned, the extent of the ''review'' is exactly the same. The only practical difference between the two remedies is that in *certiorari* the court may annul the order of the board, while in *mandamus* the court issues a peremptory writ. Whichever remedy is used, the superior court should be limited to the record produced before the board.

It is my opinion that under the cases the aggrieved party has an election of remedies—he may proceed either by *mandamus* or *certiorari*, but, so far as the evidence is concerned, whichever remedy is used the power of the superior court is exactly the same—to determine whether there is any substantial evidence to support the order of the local board, if that board exercises judicial or *quasi* judicial power.

A petition for a rehearing was denied March 29, 1941.