[Civ. No. 6155. Third Appellate District.—November 30, 1938.]

VEVA M. MARK et al., Petitioners, v. INDUSTRIAL ACCIDENT COMMISSION OF THE STATE OF CALIFORNIA et al., Respondents.

McGilvray & McGilvray and Claude M. Adams for Petitioners.

Everett A. Corten for Respondents.

PULLEN, P. J.—Petitioner, the widow, and Mary Lucille Mark, a minor step-daughter of Howard Mark, seek to review and annul the findings and award of the Industrial Accident Commission, wherein it was held that the evidence failed to establish that the death of Howard Mark was caused, contributed to or accelerated by his employment.

Petitioner contends that on June 15, 1937, the decedent, Howard Mark, sustained a coronary occlusion as the result of violent and unusual exertion in his employment, and that such coronary occlusion was the proximate cause of his death on July 31, 1937.

The commission held that the evidence failed to establish that the death of Mark was caused, contributed to or accelerated by the particular coronary occlusion on June 15th but that death was the result of an underlying pathological condition of the heart and organs, without reference to the particular occlusion, and as a result of that finding, relieved the employer from liability.

It is necessary, in order to pass upon this question, to analyze the testimony adduced. In doing so we have in mind that as early as 1911 the people of the state adopted the first Workmen's Compensation Act (Stats. 1911, p. 796), which has been amended and revised from time to time, although in general the essential provisions of the earlier acts have

been incorporated into the later enactments. The present act (Workmen's Compensation Act of 1917, Stats. 1917, p. 831) is based upon the status of the individual and not upon any theory of contract, and that an employee is entitled to compensation for an injury sustained in the industry, regardless of any breach of duty upon the part of the employer, the compensation being a charge against the system, and comes out of production. In the case of death of the workman in the course of his employment it is the intent of the act to relieve society of the burden of caring for his dependents, and to place that burden upon the industry. (*Harlan* v. *Industrial Acc. Com.*, 194 Cal. 352 [228 Pac. 654].) The act itself imposes upon the courts the duty to liberally construe the various beneficial provisions of the act to the injured and bereaved persons.

With the foregoing mandate in mind we find from the evidence that Howard Mark was, on June 15, 1937, and for some time prior thereto, employed as superintendent of the Borden ranch. He was about fifty years of age and weighed about 250 pounds, 6 feet three inches tall and in apparent good health.

George B. Schickel, a fellow employee, testified before the commission that about 7 o'clock on the morning of June 15, 1937, he and Mark lifted into a truck a motor weighing about 200 pounds and took it to one of the pump houses on the ranch and installed it. They then attempted to start the motor by cranking it; they took turns trying to start the motor until about 10 o'clock but were not successful. The witness testified that when they quit cranking "they were both of them all in, meaning they were very tired and exhausted". After quitting the engine, having failed to get it started, from the testimony of another witness, one Swenson, we learn that Mark, for about an hour drove a Ford truck which was being used to raise bales of hay to a barn loft. At the midday meal Mark ate a heavy dinner of pork, potatoes, vegetables, bread and butter, apple pie and iced tea. After dinner Mark again assisted, for a short time, in lifting the bales of hay, and again driving the truck, when he told those working with him he felt sick and shortly thereafter vomited, and then went into the cook house and lay down.

The cook, Mrs. Fraser, testified as to the quantity of food consumed by decedent, and, as did other witnesses, that the day was hot. She testified that decedent came into the kitchen and complained of being ill and lay down. About an hour or so later Dr. Adams was called but did not arrive at the ranch until about 5 o'clock. He examined Mr. Mark and told Mrs. Fraser he was suffering from a heart attack due to the heat of the day and the drinking of too much ice water. Upon the doctor's orders Mark was taken to the Sutter Hospital in Sacramento.

Dr. Gundrum, specializing in diseases of the heart, testified he was called to the Sutter Hospital about 8 o'clock on the evening of June 15th, and made a careful examination and found Mark suffering from coronary occlusion, which was confirmed by the cardiogram. Mark remained in the hospital and under Dr. Gundrum's care for about twelve days, when he was permitted to return home, not as cured but because further hospitalization was not required. He returned to the hospital on July 19th, and died July 31st. An autopsy was then performed by Dr. Guttman, a pathologist at the Sutter Hospital, who submitted a very detailed report, but in brief the examination showed coronary sclerosis with occlusion and infraction of the left ventricle, confirming the diagnosis of Dr. Gundrum.

We need not go into the testimony of Dr. Gundrum, except that he testified that over-exertion to the point of exhaustion would, and in his opinion did, bring about the collapse of the walls of the heart arteries and caused the death of Mark.

There is also in evidence a report by Dr. J. Marion Read, a cardiologist of San Francisco, who confirmed the diagnosis and conclusions of Dr. Gundrum.

The commission, however, entirely rejected these conclusions and adopted the conclusions of Dr. Bolin and Dr. Kaufman, both of San Francisco. Neither of these doctors had ever seen the decedent, either in life or death, and based their findings merely upon a reading of the files in the case. However, these specialists agree with Dr. Gundrum, Dr. Guttman and Dr. Read in their diagnosis, but ascribe the death to natural causes.

Dr. Bolin stated in his written report to the insurance carrier, which was filed with the commission, that he agreed

with the diagnosis of Drs. Gundrum, Adams and Guttman, but in considering the evidence stated that such evidence did not show "a case of a man dying from an attack of coronary occlusion which had attacked him for the first time. Occlusion of the coronary vessels are the cause of death in many men, but they seldom die in the first attack. I think that the evidence here shows that this is not the first attack of coronary occlusion that Mr. Mark had sustained. Mr. Mark was a heavy man who ate heartily, worked hard and was comparatively insensitive to pain. If one of the smaller arterioles of the heart had been blocked there would have been a very slight amount of pain which would be ignored by Mr. Mark." " . . . There is quite a difference between a fresh thrombus which may have happened a few hours before death, and an old partly healed thrombus, which may have been a month old. In this case it is probable that the thrombus was at least a month old. . . . " Here the death did occur a little more than a month after the attack. Dr. Bolin also seems to infer the particular work done by the decedent on June 15th, required merely the ordinary amount of exertion which was probably required every day on the ranch. That is not the evidence. It is undisputed that this particular work was exceptionally heavy and exhausting, and was not required except on rather infrequent intervals. Mr. Schickel, the mechanic who had charge of the pumps, said "once in a while", and estimated the difficulty in starting the motors might average once a month; sometimes such a thing would not happen in three months. The witness also testified that both he and Mark were "all in" and that it was particularly hard work, and not the ordinary daily ranch work. It is in evidence that in cranking the motor it was necessary to work in a stooped position, the pump being about a foot and a half above the ground, and that it was a hot day, the temperature being 100 degrees or over. It is true that the weather reports from the weather bureau in Sacramento showed a maximum temperature of 74 degrees for June 15th, but it does not appear where that recording was taken. On the Borden ranch we have the testimony of Schickel that it was 100 or 101 degrees, as well as the testimony of Mrs. Fraser and Dr. Adams.

Dr. Bolin said further: " . . . Although the coronary occlusion probably happened during the time that Mr. Mark

was at work I believe that the coronary occlusion had no relation to the work, . . . After the treatment he received, Mr. Mark recovered, due to the fact that individuals with previous coronary occlusion generally have a well-developed collateral circulation. This was enough to cause the heart to go along for some time, until from some unknown cause the heart was unable to carry on and became dilated, causing the heart failure . . . " And as a conclusion Dr. Bolin found "that Mr. Mark died of congestive heart failure following an attack of coronary occlusion, which was neither caused, aggravated, nor precipitated by an alleged injury arising out of or occurring in the course of his employment", and therefore there was no industrial liability for his death.

Dr. Kaufman likewise rendered his opinion to the insurance carrier upon the basis that the deceased, on the morning of June 15th, was performing his ordinary work. In the report he says: "There is, however, in this file, no evidence of unusual violent physical exertion. There is no evidence of unusual physical exertion, nor is there unusually prolonged usual exertion resulting in unusual fatigue." We need not again point out the extensive exhaustion nor the unusual nature of the work performed by the deceased on the morning in question.

As pointed out in the case of *Winthrop* v. *Industrial Acc. Com.*, 213 Cal. 351 [2 Pac. (2d) 142], expert testimony is no stronger than the facts upon which it is predicated. In that case the court said:

"The case does not present a true conflict of evidence. The opinions of the doctors who were of the views that the fall did not produce the twisting of the pedicle, as stated in their letter reports, were based on the theory that severe symptoms did not appear until some time after the fall. The evidence, on the other hand, shows that petitioner suffered severe abdominal pains almost immediately thereafter, although her condition naturally became aggravated as time elapsed. Said opinions being based on a state of facts not shown by the record to exist, are not in conflict with the opinions of the doctors whose statements were based on the facts actually shown to exist by the evidence of petitioner and the doctors who attended her."

Assuming, if necessary, that decedent was afflicted with a weak and somewhat devitalized heart, that in itself is not

determinative of the question here. If deceased was afflicted with such a condition and thereafter subjected himself to violent exertion and extraordinary strain in the course of his employment which caused his death sooner than he otherwise might have suffered, his dependents are entitled to compensation. (*Eastman Co.* v. *Industrial Acc. Com.*, 186 Cal. 587 [200 Pac. 17].)

We have the undisputed testimony that the work of cranking the engine was both unusual and exhausting. Whether or not the decedent was so engaged in work that required an unusual physical exertion is a matter which should have been determined by the commission. (*Knock* v. *Indusirial Acc. Com.*, 200 Cal. 456 [253 Pac. 712].)

Without going further into the various questions presented, we are of the opinion that the commission was in error in refusing the award, and the order is annulled.

Thompson, J., concurred.