[Civ. No. 12287.   First Dist., Div. One.   Mar. 22, 1943.]

JOSEPHINE BRANT, Respondent, v. RETIREMENT BOARD OF SAN FRANCISCO et al., Appellants.

John J. O'Toole, City Attorney, and Reynald J. Bianchi, Deputy City Attorney, for Appellants.

Milton Marks and Morris Lowenthal for Respondent.

PETERS, P. J.—The Retirement Board of San Francisco, on which there are seven qualified members, by a vote of three to two (two members being absent) denied the application of respondent Josephine Brant for a pension. A rehearing was denied by a vote of two to two. Thereafter, respondent filed petitions for writs of certiorari and mandate with the superior court to secure a review of the board's ruling. The court ruled that petitioner was entitled to a writ of mandate compelling the granting of the pension, and denied certiorari because the requested relief had been granted by mandate. From this judgment the board appeals.

The board contends that it is a local quasi-judicial body, and that its findings may be disturbed by a court only if there is no substantial evidence before the board in their support. There can be no doubt that, if the city charter confers judicial power on the board, its findings, based on conflicting evidence, are binding on the courts whether review is sought by mandate or certiorari. (*Naughton* v. *Retirement Board of S. F.*, 43 Cal.App.2d 254 [110 P.2d 714] ; *Walker* v. *City of San Gabriel*, 20 Cal.2d 879 [129 P.2d 349].) The question as to whether the charter of San Francisco confers judicial power on the appellant board is not free from doubt. The trial court assumed that the board exercised judicial functions. For the purposes of this opinion we will indulge in the same assumption. The exact question presented, therefore, is whether there was any substantial evidence to support the determination of the board.

The respondent is the widow of Elmer Brant who died of cerebral hemorrhage on December 20, 1937. From 1922 to the date of his death, Brant was employed as a fireman holding the rank of truck driver. The city charter (§ 169) provides that in the event any member of the fire department ''shall die as a result of any injury received during the performance of his duty, or from sickness clearly, unmistakably and directly

caused by and resulting from the discharge of such duty'' his family shall be entitled to a pension. It is respondent's contention that her husband died as a result of complications which followed an illness contracted in the performance of his duties.

The evidence shows that Brant was forty-five years old at the time of his death, and that prior to January of 1937 he was a normal, healthy, athletic man. On January 11, 1937, on a cold day, in a driving rain, Brant, together with the other members of his firehouse, was called upon to fight a fire which lasted over five hours. All of the men received a severe drenching. Nearly every man in the firehouse, within a short time after the fire, contracted a severe cold, and was compelled to take time off. ·Brant contracted such a cold, which, by January 15th, had developed into influenza and bronchial pneumonia. He was very ill for a period of twenty days with the pneumonia attack. Respondent's evidence was to the effect that the pneumonia attack left Brant with a hacking severe cough; that from February, 1937, to the time of his death in December of that year he had frequent and extended coughing spells. During this period Brant was under the care of a physician who prescribed for the cough but was unable to check it. Brant collapsed in the bathroom of his home on the morning of December 20, 1937, with a cerebral hemorrhage. He died from that cause in the afternoon of that day. Respondent's evidence was that prior to getting out of bed on that morning Brant had a severe coughing spell, and that he had another spell after he went to the bathroom to shave. It was her contention, sustained by the trial court, that the fire of January 11th caused the pneumonia, the pneumonia caused the cough, and the cough caused the strain that resulted in the bursting of the blood vessel in Brant's brain that resulted in his death.

The fact that eleven months expired between the exposure and the death in no way militates against petitioner's claim if the evidence produced, without substantial conflict, establishes the proper causal relationship. ▇ Pension laws are to be liberally construed and applied to the end that the beneficent policy thereby established may be accorded proper recognition. (*Dillard* v. *City of Los Angeles,* 20 Cal.2d 599 [127 P.2d 917] ; *Casserly* v. *City of Oakland,* 215 Cal. 600 [12 P.2d 425].)

▇ The records of appellants show that on January 11, 1937, Brant was subjected to an unusual exposure in fighting a fire for five hours in a cold, driving rain. There is no dispute

but that most of the men from Brant's firehouse shortly thereafter came down with severe colds. Brant developed a cold which developed into influenza and bronchial pneumonia within four days of the exposure. The evidence of his then attending physicians, of his fellow workers, and of his family, establishes, without conflict, that the exposure was the cause of the pneumonia. When a healthy young man is subjected to five hours of exposure, and shortly thereafter develops pneumonia, and there is no evidence of any intervening cause that would produce pneumonia, it requires no expert knowledge to conclude that the exposure was at least a contributing cause of the pneumonia.

The second step in the chain of causation—that the cough was the result of the pneumonia and continued until the time of death—was proved by overwhelming testimony. Respondent testified that Brant was left with a severe cough after the pneumonia attack, and that such affliction, with increasing severity, continued until the time of death. Dr. John McKay, one of the doctors who attended Brant during the pneumonia attack and who also attended him between February and November, 1937, for the resulting cough, testified that Brant was left with a severe cough as the result of the bronchial pneumonia; that such is a common complication of that disease; that he had prescribed for Brant for the cough but had been unable to check it; that he had seen Brant seven or eight times during the year at his office; that Brant complained of the severe cough and asked for relief; that he had prescribed five different prescriptions for the cough; that the cough was very harsh, dry and hacking; that during an attack the cough was "so severe, in fact, that it lasted for a considerable length of time, and would cause his face, of course, to become red, and the veins of his neck and temporal region to become distended." The severity of the cough and its continuous nature were graphically described by many of the witnesses. Respondent testified that during the frequent coughing spells "the temples would throb, his eyes would bulge, and the muscles and cords in his neck would stand out like he was strangling"; that the cough increased in severity toward the end of the year; that frequently the spells were so severe "he would lose his dinner"; that frequently he would awaken at night "coughing so severe he would have to get up and walk the floor, he couldn't stand it"; that the various cough medicines gave but temporary relief. Brant's daughter, Imelda,

described, in detail, the nature and extent of the coughing spells suffered by Brant during 1937. She testified that "it just seemed like he was choking and you would just be able to tell what was going on inside; the veins up here [forehead] would pop out, his eyes would bulge, his face would get liver red." Virginia, another daughter of Brant, also testified as to the continuous nature of the coughing spells. She testified that "when he used to cough his whole body used to tremble. He used to hold his head in his hands, his eyes would bulge, his face would get real red, the temples up here would stand out. We often remarked it looked like a blood vessel was going to break, he coughed so hard; it seemed that his whole body was being torn apart." She also testified that as the months went on the cough became increasingly severe, and that on the night of December 19th, he had a very bad spell, coughing continuously for about fifteen minutes; that on the morning of December 20th she heard her father coughing in the bathroom; that shortly thereafter they heard him breathing heavily and opened the door and found him unconscious on the floor.

Grace Wiebusch had known the Brants for ten years. She testified that she and her husband normally saw the Brants about three times a week; that before January, 1937, Brant was a well man; that thereafter his cold grew increasingly worse; that "he used to cough until he was exhausted; his face would be red; and he would hold his head in his hands and sit; and he would sit there until he was through coughing— it looked as if he was worn out"; that she never saw him between January and December, 1937, when he didn't cough to some extent. It was stipulated that if Mr. Wiebusch were called he would testify as to the same facts testified to by Mrs. Wiebusch.

Luke Angelich had known and worked with Brant in the fire department for ten years prior to Brant's death. He had worked at the January fire and he, together with five other men from that firehouse, had caught a severe cold as a result of the exposure at that fire. He had taken nine days off as a result of his cold. He testified that Brant was coughing quite a bit when he returned to work after the pneumonia attack; that he noticed Brant taking cough medicine from that time until his death; that for the six months prior to Brant's death the cough continued; that it was "a severe cough"; that when he was working with Brant on the night shift his bed was next to Brant's and that "there was no sleeping next to him;

that's how bad it [the cough] was''; that when he would cough, particularly at night, ''he would remind you of a kid getting the whooping cough; he would gag, coughing; he would get a cough so bad he couldn't stop . . . he would be as red as a beet, like a child with whooping cough. He would strangle from coughing''; that he would sometimes get four or five spells a night; that the cough was more severe at night than during the day; that Brant always had a cough after the pneumonia attack.

Ralph W. Bradley was another fireman from the same firehouse who had worked with Brant for seven years and had known him for eleven years. He testified that for the last six or nine months of Brant's life he ''seemed to have a continual cough . . . he would flush at the face, and it was a very deep cough. He would turn red and it was sort of a continual cough. He seemed to cough all the time.''

Raymond W. Remy, a lieutenant in the fire department and Brant's superior officer for ten years, also was called as a witness. He described the January 11th fire, and testified to the severe drenching received by his men, including Brant. He also testified that it was cold enough that morning to turn the skin blue; that Brant, prior to that fire, was in good health; that after the pneumonia attack he had a slight cold; that ''he was coughing around there right along, but how long it continued is too far back for me to remember''; that ''he was always coughing more or less,'' but that the cough did not incapacitate him; that he had no recollection of seeing Brant in such terrific spells as described by his fellow workers; that he, as an officer, had a separate room, and did not sleep with the men; that if Brant coughed at night he would not know about it; that he can remember Brant had a cough and that it continued through 1937.

Harry Wrin, another fireman who had worked with Brant for many years, and who had contracted a cold at the 1937 fire, testified that after the pneumonia attack Brant had a cough, and that previous to his death he had a severe cough; that he used to ''kid'' Brant during 1937 for taking cough medicine; that Brant's cough was severe, ''he would cough, and he got rather red in the face.''

This is a fair summary of the evidence on the issues as to whether the fire caused the pneumonia and whether the pneumonia caused the cough. Appellants urge that there was a conflict in the evidence on these two issues. After reading the

record we are of the opinion that the above summarized evidence stands uncontradicted and unimpeached. Appellants refer to one answer given by Mrs. Brant and from that one answer contend it may be inferred the pneumonia was not caused by the fire. Mrs. Brant, after testifying several times that prior to the fire her husband had been healthy and athletic and had only occasional colds from which he quickly recovered, was asked if Brant had coughed prior to that fire. She answered, ''Prior to the fire he had a cold.'' She was then asked, ''I mean, did he do any coughing?'' The transcript continues: ''A. Not before that, because in winters, like when he was out, exposed in any way, he would develop some sort of a cold, and he would have a slight cough, but it never stayed with him. Q. Well, take a month or 60 days before the Clay Street fire, was he coughing? A. No, sir.'' It is obvious from a fair reading of the testimony that what Mrs. Brant testified to was that prior to 1937 Brant had had occasional colds, but that coughing caused thereby was slight, and that he recovered from the cough in a short time. Appellants' contention that she testified that Brant was sick at the time of the fire clearly is a distortion of the record. The other testimony relied upon as creating a conflict on this issue, other than that of Dr. Kilgore, which will later be discussed, is so clearly not susceptible of the interpretation given to it by appellants that it need not be discussed.

As creating a conflict on the issues as to whether the pneumonia caused the cough, and whether the cough continued from the pneumonia to the time of death, appellants rely on a couple of isolated sentences, separated from their context, from the testimony of Bradley, Angelich and Remy. These three men were testifying in 1940 as to facts that occurred three years before. They could not be absolutely positive as to dates. All three testified that after the pneumonia attack Brant had a cough. They all thought it got some better during the summer months but that for ''six,'' or ''eight'' or ''nine'' months before Brant's death the cough became increasingly severe.

The main testimony relied upon by appellants as creating a conflict on this issue, other than that of Dr. Kilgore, to be later discussed, is that of Lieutenant Remy. The Lieutenant, after testifying as to the existence and continuous character of Brant's cough, was asked if he recalled Brant coughing so violently his face got red and the veins swollen as a result. He replied that he did not ''recollect'' having observed such

an experience by Brant. He did testify as to Brant's coughing, and admitted that as an officer he was quartered in a different portion of the building from Brant and the other men. His testimony as to the severity of the cough was purely negative, and in no way conflicts with that of the other witnesses above summarized.

On the issue of whether the coughing caused the cerebral hemorrhage, Imelda testified that on the morning of December 20th, her father had a severe coughing spell in bed that lasted at least ten minutes. The existence of this spell was corroborated by the other members of the family, all of whom testified that Brant then got up and went into the bathroom. Virginia Brant testified that while he was in the bathroom she heard him coughing again, then she heard him breathing heavily, and, upon opening the door, found him collapsed on the floor. Appellants make much of the fact that Imelda and Mrs. Brant could not remember hearing Brant cough in the bathroom, but Mrs. Brant did testify that Virginia, while Brant was in the bathroom, told her, "Daddy is coughing." Obviously, this creates no conflict.

Dr. Thomas D'Arcy Quinn was called to assist in the care of Brant after he had been taken to the hospital on December 20th. He testified that from the physical examination then made he ascertained that Brant was dying from a cerebral hemorrhage; that Brant was then unconscious; that he had a talk, before Brant died, with Mrs. Brant, and she told him about these coughing spells; that he told Mrs. Brant then that he believed that the strain caused by the coughing caused the hemorrhage; that from an examination of the transcript in this case, from facts gained from a physical examination made by him of Brant in the past, and from attending him on the day of his death, in his opinion "the cough, the chronic, extremely severe cough that he had, had a great deal to do with getting an attack of apoplexy"; that coughing causes a congestion in the brain and causes a dilation and engorgement of the blood vessels, and that "one of those delicate blood vessels [in the brain] is very liable to rupture under those circumstances"; that although the autopsy showed "cerebral vessels: moderately sclerosed," such moderate sclerosis was not the whole cause of the hemorrhage; that the principal cause of the apoplexy was the coughing; that coughing will shoot the blood pressure up to twenty or thirty pounds very quickly; that apoplexy is caused by some strain or trauma;

that he has treated ''quite a few cases where I think the chronic cough that they had for years contributed a great deal to the cerebral hemorrhage''; that Brant was suffering from chronic bronchitis and that a chronic bronchitic never gets entirely over his cough. He was asked if he could account for the hemorrhage by any other reasonable hypothesis except from the coughing, to which he replied: ''My opinion is that the coughing was a very great contributing cause of the hemorrhage, and I cannot account for it in any other way''; that the spell Brant had on December 20th could have caused the hemorrhage even without a prior history of coughing, but the prior history made it much more likely that it was caused by the coughing.

Dr. John McKay was the Brants' family doctor prior to 1937, was acquainted with Mr. Brant prior to 1937, and had examined Brant in 1935 as an applicant for lodge insurance. He attended Brant during the pneumonia attack, was his physician thereafter, and was called in immediately after the attack of December 20th, and attended him until his death. He testified that prior to January, 1937, he saw Brant frequently and that during that period Brant had no cough at any time he saw him; that on January 15, 1937, he was called in and found Brant with a very serious case of bronchial pneumonia; that for the first week he did not think Brant would live; that as a result of the bronchial pneumonia Brant was left with a ''severe cough''; that such result was a common complication of bronchial pneumonia; that from February to November, 1937, he prescribed for Brant's cough; that the medicine prescribed was solely for the cough; that during the months mentioned Brant called at his office for medical advice concerning the cough seven or eight times; that he prescribed five different prescriptions for the cough, each of which was refilled many times; that he had observed Brant coughing during this period; that he had a harsh, dry hacking cough which was very severe, and caused congestion in the temporal regions; that when he was called to the Brant home the morning of December 20th, Mrs. Brant told him that Brant had had a severe coughing attack before going to the bathroom; that he diagnosed Brant's condition as cerebral hemorrhage. He was then asked to give his opinion as to the cause of death, and to base his opinion upon the autopsy report showing cerebral hemorrhage as the cause of death, and his observation as attending physician during 1937. He replied that ''in my opin-

ion, there is no doubt about it, that a severe cough would do that. It would raise the blood pressure to a certain point, and that would break that artery and cause the hemorrhage. Q. Was the cough, of the kind that you observed Mr. Brant had during 1937, and for which you treated him, of sufficient character to bring about the result that you have just described? A. I would say, yes, it was of a very severe character, and could cause it. Q. And is it your judgment that the cough which Mr. Brant had brought about the cerebral hemorrhage from which he died? A. I certainly believe that." He also testified that cerebral hemorrhage is frequently caused by excessive strain which raises the blood pressure, and that here the only evidence of strain was the coughing; that a severe cough raises blood pressure forty points; that a well known medical book, which he named, lists coughing as a common cause of cerebral hemorrhage; that the cough was caused by the bronchial pneumonia; that there is no doubt in his mind that the pneumonic condition of January 15th was tied up with the fire and wetting of January 11th.

The appellants, while admitting that the above summarized evidence supports the conclusion that the fire of January 11th was a proximate cause of the cerebral hemorrhage, contend that the testimony of Dr. Eugene Kilgore, produced as an expert witness by the board, supports the board's finding to the contrary. Dr. Kilgore had never attended or seen Brant in his lifetime, his testimony being given as an expert, and his opinion was based on the record produced before the board which he had read. He was asked if he had formed an opinion as to whether the exposure at the fire caused the death. He replied that "I think there is a very remote possibility that that was so"; that he based his opinion on the fact that this man attended a fire on January 11th and became cold and wet and that "four days later he contracted pneumonia"; that it was the theory of respondent that the drenching at the fire caused the pneumonia, that the pneumonia caused the protracted severe cough, and that the cough caused the cerebral hemorrhage; that "I think all these suppositions are possible, but I think, in varying degrees, improbable."

He then took up each step separately. As to whether the drenching caused the pneumonia, he testified, "this is certainly possible," that severe exposure to cold is frequently followed by pneumonia; that in this case the pneumonia did not show up for four days; that such a time element "does not necessar-

ily rule out a connection between the drenching and the pneumonia, but makes it a little less probable''; that respiratory diseases are common in January; that other men in the department had respiratory diseases at this time; that while ''it is easily possible that Mr. Brant's presence at that fire caused the pneumonia, the odds are rather against that association.''

Turning to the second link in the chain of causation—that the pneumonia caused the cough—he assumed ''that that is the case''; that the autopsy found the lungs to be negative and that this ruled out ''bronchiectasis, which is the common cause of protracted cough following pneumonia.'' He concluded: ''While, therefore, I believe it possible that the pneumonia caused the long-lasting severe cough, I think the chances are rather against this supposition.''

As to whether the cough caused the cerebral hemorrhage, he testified that ''is a not unreasonable, a priori, assumption, for it is well known that arterial blood pressure momentarily rises very much at the time of severe cough. Textbooks of medicine also make reference to the possibility of the severe cough causing the cerebral hemorrhage,'' but that such association ''is not a common experience''; that in his experience he cannot remember a single case of cerebral hemorrhage following immediately after a severe cough; that he had talked with three unidentified doctors concerning this case, and none of them remembers a cerebral hemorrhage that they thought resulted from a severe cough; that when the frequency of cerebral hemorrhage and frequency of coughing in cases of arterial disease are considered, the fact that death from coughing does not occur more often ''makes me doubt very much that the coughing caused the cerebral hemorrhage in this case''; that coughing does cause a rapid rise in the blood pressure; that for all these reasons it was ''very highly probable that the drenching had nothing to do'' with Brant's death.

On this record the trial court found the facts concerning the fire and exposure, and then found that ''all of the evidence . . . showed, without any conflict, that . . . Elmer J. Brant . . . died from a cerebral hemorrhage caused by a cough condition from which he was suffering as a result of the activities and work performed by said Brant at said fire of January 11, 1937''; that the evidence before the board ''was susceptible of but one conclusion, namely, that petitioner was entitled to a pension, and said evidence fully and overwhelmingly sus-

tained each and every allegation of said application . . . without any material evidence of any kind or character being offered in contradiction of or opposition to said evidence and there is no conflict in the evidence produced before the respondent Retirement Board''; that there ''was no substantial or any evidence presented or introduced before said Retirement Board . . . to support a denial of petitioner's application for a pension''; that the testimony of Dr. Kilgore, called as an expert witness by the board ''did not constitute substantial or any evidence in support of a denial by said Retirement Board of petitioner's application for a pension and did not, factually or legally, constitute or create a real or a substantial conflict in the evidence produced by the petitioner before the . . . Retirement Board. In this respect, this Court further finds (a) the testimony of said Dr. Eugene Kilgore constituted merely the opinion and conclusion of a physician who had not treated, examined or seen Elmer J. Brant; (b) the testimony . . . was based on matters not appearing in the record or evidence before the Retirement Board and his opinion and conclusions were based upon a state of facts not shown by the record to exist or upon a state of facts at variance with the uncontradicted facts shown by the record to exist and in some material respects his testimony and his opinion and conclusions were at variance with matters of common knowledge and at variance with the record and the uncontradicted evidence before the Retirement Board; (c) the testimony of Dr. Eugene Kilgore was purely speculative and conjectural and constituted merely a statement of conclusions and probabilities without evidence in support thereof; (d) at the very most, the testimony of said Dr. Eugene Kilgore constituted a mere conflict in words and not a substantial and real conflict in the evidence and was wholly insufficient to support a decision denying the application . . . for a pension''; that all the other evidence produced before the board, including that of Brant's two attending physicians, ''constituted positive, uncontradicted, competent, and credible evidence and fully and overwhelmingly supported petitioner's application for a pension,'' and that ''the only conclusion that could reasonably be drawn'' therefrom was that Brant died from a cerebral hemorrhage caused by a cough condition contracted at the January 11th fire.

We are of the opinion that these findings are amply supported by the record. It will be noted that Dr. Kilgore assumed that the pneumonia did not develop until four days

after the fire. That is contrary to the uncontradicted facts, and at variance with matters of common knowledge. The evidence shows that shortly after the fire Brant developed a cold, which, by January 15th, had developed into pneumonia. The record also shows that because of his cold Brant did not work on January 14th, but secured another man to work for him. When Dr. McKay was called in on January 15th he found Brant in a very serious condition and feared for his life. Certainly, it is a matter of common knowledge that such a condition did not develop instantaneously but must have developed over several days. Thus, the basic premise upon which Dr. Kilgore based his opinion that the ''probabilities'' were that the exposure at the fire did not cause or contribute to the pneumonia, is contrary to the record.

Moreover, in giving his opinion concerning each of the three steps in the chain of causation, Dr. Kilgore did not testify that any one of the steps was impossible or did not occur. He admitted frankly and fairly that each step was ''possible,'' but testified, hypothetically, that in any given case, the three steps together were ''improbable.'' As opposed to that testimony, we have the positive, unequivocal testimony of the attending physician that in this particular case—not in a hypothetical case—the pneumonia caused the cough and the cough caused this particular cerebral hemorrhage. Under such circumstances, what might have occurred, what may occur in many or most cases, what the ''probabilities'' might be, creates no conflict with positive testimony as to what did occur in this particular case. It should also be noted that Dr. Kilgore admitted that the cerebral hemorrhage was caused by some sort of a strain. There was no evidence of any other strain than that caused by the coughing. No alternative theory or facts appear in the record. As was said in *Reese* v. *Smith*, 9 Cal.2d 324, 328 [70 P.2d 933], ''A majority of chances never can suffice alone to establish a proposition of fact, since the slightest real evidence would outweigh all contrary probabilities.''

The rule is well settled in this state that, as against positive, uncontradicted factual evidence applicable to the particular case, particularly when given by attending physicians, opinions of experts as to probabilities or possibilities (particularly when partially based on erroneous assumptions) creates no conflict. (*Thoreau* v. *Industrial Acc. Com.*, 120 Cal.App. 67 [7 P.2d 767]; *Singer* v. *Industrial*

*Acc. Com.,* 105 Cal.App. 374 [287 P. 567]; *Winthrop* v. *Industrial Acc. Com.,* 213 Cal. 351 [2 P.2d 142]; *Gamberg* v. *Industrial Acc. Com.,* 138 Cal.App. 424 [32 P.2d 413]; *Nielsen* v. *Industrial Acc. Com.,* 125 Cal.App. 210 [13 P.2d 517]; *Mark* v. *Industrial Acc. Com.,* 29 Cal.App.2d 495 [84 P.2d 1071]; *Blankenfeld* v. *Industrial Acc. Com.,* 36 Cal.App.2d 690 [98 P.2d 584].) While it is true that an appellate court has no power to set aside findings of a judicial body vested with fact finding power when such findings are based on conflicting evidence, it is equally well settled that for that rule to apply the conflict must be substantial and real and not fanciful or fictitious. (*Thoreau* v. *Industrial Acc. Com., supra; Gamberg* v. *Industrial Acc. Com., supra; Burns* v. *Faget Engineering Co.,* 53 Cal.App. 762 [200 P. 818]; *Houghton* v. *Loma Prieta Lumber Co.,* 152 Cal. 574 [93 P. 377].)

For these reasons it must be held that the findings of the trial court to the effect that the findings of the board are totally unsupported, are themselves supported by uncontradicted evidence.

The judgment is affirmed.

Knight, J., and Ward, J., concurred.