[Civ. No. 12873. First Dist., Div. One. Dec. 13, 1945.]

ELIZABETH M. DORNELL, Respondent, v. RETIREMENT BOARD OF SAN FRANCISCO CITY AND COUNTY EMPLOYEES' RETIREMENT SYSTEM et al., Appellants.

John J. O'Toole, City Attorney, and Norman Sanford Wolff, Deputy City Attorney, for Appellants.

Melvin M. Belli for Respondent.

SCHOTTKY, J. pro tem.—Lloyd Dornell was a member of the San Francisco Fire Department for 17 years prior to his death on March 5, 1941. His widow, Elizabeth M. Dornell, applied to the Retirement Board of the San Francisco City and County Employees' Retirement System for a pension, claiming that her husband's death was industrial in character and resulted from illness caused by the performance of his duties as fireman. Section 169 of the city charter provides that in the event any member of the fire department "shall die as a result of any injury received during the performance of his duty, or from sickness clearly, unmistakably and directly caused by and resulting from the discharge of such duty" his family shall be entitled to a pension. The retirement board, after hearing, concluded that Lloyd Dornell's death was not industrial in character and that he did not die as a result of any injury sustained while in the performance of his duties as an employee of the Fire Department of the City and County of San Francisco. A petition for rehearing was denied. Thereafter, respondent filed a petition for a writ of mandate in the superior court to compel the board to grant her the pension she sought. The case was submitted to the court upon the record of the evidence and testimony as submitted before the retirement board. The court ruled that petitioner was entitled to a writ of mandate compelling the granting of the pension. From this judgment the board appeals.

It is conceded by both respondent and appellants that appellant retirement board is a local quasi judicial body and that its findings may not be disturbed by a court if there is any substantial evidence before the board to support them. The City Charter of San Francisco confers judicial powers upon the board, and its findings, based on conflicting evidence, are binding on the courts. (*Brant* v. *Retirement Board of S. F.*, 57 Cal.App.2d 721 [135 P.2d 396]; *Naughton* v. *Retirement Board of S. F.*, 43 Cal.App.2d 254 [110 P.2d

714] ; *Walker* v. *City of San Gabriel,* 20 Cal.2d 879 [129 P.2d 349, 142 A.L.R. 1383].) The principal question presented upon this appeal, therefore, is whether there was any substantial evidence to support the determination of the board.

It is the contention of appellants that the trial court erred in finding that the evidence introduced before the board was susceptible of but one construction, namely, that respondent was entitled to a pension, and also in finding that there was no substantial evidence to constitute grounds for denial of respondent's application for a pension. Respondent, on the other hand, contends that ''Not only is there no 'substantial' evidence to support the Board's ruling, there *is absolutely no evidence*'' to support it. We shall briefly summarize the evidence introduced before the board.

Lloyd Dornell had been receiving treatment for high blood pressure since November, 1939, from Dr. Lloyd E. Wilson, his family physician. The treatment consisted of medication, including nitroglycerine, and the doctor had suggested also that he try to get assigned to easier work. Twice the doctor himself asked the fire department doctor for lighter work for Dornell, but it could not be arranged. On December 3, 1940, Dornell contracted influenza. Dr. Wilson called upon him at his home on December 3d, 4th and 6th, and on the latter date found Dornell improved, and told him to stay in bed three or four more days and then get up, and to see the fire department doctor before he went back to work. On December 17th Dornell went back to work and was ordered to assist on a ''pressure test'' (also called an ''Underwriters' drill''), which consisted of putting a hose into the bay on the waterfront and pumping the water through the apparatus and hose. The hose had to be lifted up and down out of the bay several times, and it was very heavy. The job normally required four men, but only three were available on this particular day— Dornell and two other firemen, named McGovern and Locke. McGovern testified that Dornell did not look well, that he ''was only as good as half a man, for he was in bad shape. He was sick''; and that he and Locke had to do practically all the work themselves. According to the testimony of another witness, Elmer J. Rice, who was employed in the ''auto school'' of the fire department, and who was present at the test on December 17th, Dornell made the remark that ''This is a hell of a thing to do to a guy just coming back to work.''

The job lasted an hour and a half, and due to some leaking in the hose connections the firemen got their clothes wet. On returning to the fire house, Dornell was unable to change his clothes because he did not have a change of clothing there (having been assigned to that particular fire house for only one day), and he sat huddled near the furnace in the basement for about an hour, until he was relieved to go home. From December 17, 1940, up to and including January 5, 1941, Dornell reported for work every day, but he evidenced a lethargy, fatigue and loss of appetite.

On January 5, 1941, Dornell apparently did not feel well and spent all day in bed at the fire house. He returned home that night by himself and went right to bed and, according to his wife, "coughed and sweated all night," and the next day he suffered from dizziness. That day, January 6th, he had his first stroke, which affected the left side of his face. He remained home in bed until February 11, 1941, when he had a second stroke, which this time affected the right side of his body and his throat so that he could not swallow; and on February 12, 1941, he was taken to St. Mary's Hospital, where he died on March 5, 1941. The death certificate stated the cause of death as follows: "Immediate cause of death—bronchial pneumonia—three days; contributory causes: apoplexy—two months; arteriosclerosis, general and cerebral, and hypertension."

Three doctors testified before the board as to whether Dornell's death was caused by sickness resulting from the discharge of his duties: Dr. Wilson, the attending physician; Dr. H. M. F. Behneman, an expert, called by the petitioner; and another expert, Dr. Ernest du Bray, called by the retirement board. Dr. Wilson testified from his personal knowledge of the case as the attending physician, and it was his opinion that the heavy work which Dornell did on December 17, 1940, affected his condition so that it contributed to the stroke he had on January 6th; that "it could have" caused the stroke on the latter date; that the inner structure of a diseased blood vessel in his brain was weakened by the work done that day; and that "this arteriosclerotic process which was going on was hastened by any over activity or any over exertion." Dr. Wilson also testified, as stated, that in 1940, before Dornell had influenza and while he was treating Dornell for high blood pressure he twice asked the fire department

doctor, Dr. J. J. McGuire, for lighter work for Dornell, and mentioned the theater detail, but that Dr. McGuire "didn't seem to think that there was any way he could get lighter work; that as long as he was a fireman, he had to do the same work as the other men."

Dr. Behneman, petitioner's expert, testified, after reading the transcript and the testimony given by Dr. Wilson, and considering all the facts of the history brought out in the evidence in connection with the deceased, that there was a definite relationship between the work done by the deceased on December 17th and the stroke he suffered January 6th which contributed to his death; "that his going back to work when he did, and being called upon to do what he did, hastened his death from hypertension." He also testified that it was possible that some hemorrhage started on December 17th; that Dornell's general attitude of lassitude and lethargy and his fatigue and loss of appetite between December 17th and January 5th were symptoms of increased cranial pressure present at that time.

Dr. du Bray, as stated, called as an expert by the board, also read the transcript and the records in the case, and testified that it was his conclusion that the death was due to a nonoccupational disease; that on December 17th there was no increase in the degenerative process of the blood vessels which would be responsible for the hemorrhages on January 6th or February 11th. He further testified that the symptoms of lethargy, fatigue and loss of appetite which Dornell had between December 17th and January 5th were probably not symptoms of intracranial disturbance, but were convalescing symptoms from the respiratory illness; furthermore, that in his opinion there could have been no damage to the blood vessels on December 17th where it did not manifest itself for three weeks—that such a delayed showing of hemorrhage only occurred in rare cases of head or skull injuries.

The appellant board contends that there was a substantial conflict in the medical testimony and that therefore its findings cannot be disturbed either by this court on appeal or by the trial court on mandamus. Appellants argue that Dr. du Bray's expert testimony created a substantial conflict in the evidence and is sufficient to support the board's findings; that all of the facts as they existed were testified to and made part of the record before the board, and that Dr. du Bray

first read and became familiar with the record before giving his expert testimony and upon which facts he predicated his testimony; that Dr. Behneman, respondent's expert, had not known or examined Dornell during his lifetime and based his conclusions on the same record as Dr. du Bray; that Dr. Wilson had engaged in certain conjectures of his own, and although he was the attending physician when Dornell had the flu, and also when he had both strokes, he did not see Dornell on December 17th when he went back to work, nor did he see him between December 6th and January 6th, when he had the first stroke; and that his testimony, therefore, as to what caused the stroke was based not on his personal observations of Dornell but on the testimony given by other witnesses as to Dornell's condition and symptoms on December 17th and up to January 5th.

Respondent argues that Dr. Wilson, Dornell's attending physician, stated positively that death was due to the work done by Dornell on December 17th; that Dr. Behneman, respondent's expert, expressed the same opinion; and that "the only testimony adduced in favor of appellants was that of their 'expert Dr. du Bray' *who never saw the patient* and whose testimony was that there was 'A POSSIBLE' *correlation between the work on December 17th and the death.*"

Respondent further argues that Dr. du Bray's testimony did not create a conflict; that he qualified some of his statements and conclusions by such expressions as "It is possible," "this is another guess," "can't say with definiteness," and "questionable"—which made his testimony too uncertain to be "substantial evidence" to support the board's finding; and that, in any event, having testified as an expert, who did not see or treat the patient before his death, Dr. du Bray's testimony could not create any conflict with the testimony of Dr. Wilson, the attending physician, under the rule laid down in *Brant* v. *Retirement Board of S. F.*, 57 Cal. App.2d 721 [135 P.2d 396]. Respondent quotes extensively from this decision and bases her case mainly upon it. In that case the evidence showed that Brant, a fireman, on January 11, 1937, was called upon to fight a fire which lasted over five hours. The day was cold and very rainy and all the firemen received a thorough drenching. Within a short time after the fire, nearly all of them, including Brant, contracted severe colds; and on January 15th Brant's cold had devel-

oped into pneumonia. He was very ill from the pneumonia for some 20 days and it left him with a hacking cough, and up to the time of his death he had frequent and extended coughing spells. On December 20, 1937, he collapsed on the floor of the bathroom with a cerebral hemorrhage, and died that same day. The respondent's evidence was that Brant had had a violent coughing spell that morning before he got out of bed, and another after he went into the bathroom. Two doctors testified for Brant's widow, who was seeking a pension under section 169 of the charter, as is the widow in the present case. They had both attended Brant before his death. One had treated him when he had pneumonia and had prescribed for the resulting cough; the other was called in when Brant was taken to the hospital after he had collapsed, on December 20th. Both doctors gave it is as their opinion that the exposure at the fire on January 11th had caused the pneumonia, and that the severe cough was a direct result of the pneumonia attack, and was a major contributory cause of the cerebral hemorrhage which caused Brant's death. The board produced an expert, who had not seen Brant during his lifetime, but who based his opinion on the record produced before the board, which he had read. "He was asked if he had formed an opinion as to whether the exposure at the fire caused the death. He replied that 'I think there is a very remote possibility that that was so'; that he based his opinion on the fact that this man attended a fire on January 11th and became cold and wet and that 'four days later he contracted pneumonia'; that it was the theory of respondent that the drenching at the fire caused the pneumonia, that the pneumonia caused the protracted severe cough, and that the cough caused the cerebral hemorrhage; that 'I think all these suppositions are possible, but I think, in varying degrees, improbable.'" (57 Cal.App.2d at p. 730.) He stated that the facts adduced caused him to "doubt very much that the coughing caused the cerebral hemorrhage" and stated that it was "very highly probable that the drenching had nothing to do" with Brant's death. The board denied the widow a pension and she took the matter into the superior court on mandamus. The court found in her favor, on the grounds that under the testimony produced before the board " 'the only conclusion that could reasonably be drawn' therefrom was that Brant died from a cerebral hemorrhage caused by a cough condition contracted at the January 11th fire''; that the testimony of the expert

"did not constitute substantial or any evidence in support of a denial" of the pension by the board and did not create a substantial conflict in the evidence because (1) it was the opinion of an expert who had not treated Brant; (2) it was based on a state of facts not shown by the record to exist; (3) it was purely speculative and conjectural; and (4) at the very most it constituted a mere conflict in words, was not a substantial conflict and was wholly insufficient to support a decision denying the application for a pension. This court held that these findings were supported by the record. The opinion points out that the expert assumed that the pneumonia did not develop until four days after the fire, and that this assumption was "contrary to the uncontradicted facts, and at variance with matters of common knowledge." Furthermore, the opinion states that in giving his opinion the expert did not testify that any one of the steps in the chain of causation (whether the drenching at the fire caused the pneumonia, the pneumonia caused the cough, and the cough caused the cerebral hemorrhage) was impossible or did not occur, but merely that these steps were "improbable." The court there holds: "Under such circumstances, what might have occurred, what may occur in many or most cases, what the 'probabilities' might be, creates no conflict with positive testimony as to what did occur in this particular case. . . . The rule is well settled in this state that, as against positive, uncontradicted factual evidence applicable to the particular case, particularly when given by attending physicians, opinions of experts as to probabilities or possibilities (*particularly when partially based on erroneous assumptions*) creates no conflict. (*Thoreau* v. *Industrial Acc. Com.*, 120 Cal.App. 67 [7 P.2d 767] ; *Singer* v. *Industrial Acc. Com.*, 105 Cal.App. 374 [287 P. 567] ; *Winthrop* v. *Industrial Acc. Com.*, 213 Cal. 351 [2 P.2d 142] ; *Gamberg* v. *Industrial Acc. Com.*, 138 Cal.App. 424 [32 P.2d 413] ; *Nielsen* v. *Industrial Acc. Com.*, 125 Cal.App. 210 [13 P.2d 517] ; *Mark* v. *Industrial Acc. Com.*, 29 Cal.App.2d 495 [84 P.2d 1071] ; *Blankenfeld* v. *Industrial Acc. Com.*, 36 Cal.App.2d 690 [98 P.2d 584].) While it is true that an appellate court has no power to set aside findings of a judicial body vested with fact finding power when such findings are based on conflicting evidence, it is equally well settled that for that rule to apply the conflict must be substantial and real and not fanciful or fictitious. (*Thoreau* v. *Industrial Acc. Com., supra; Gamberg* v. *Industrial Acc. Com.,*

*supra; Burns* v. *Faget Engineering Co.,* 53 Cal.App. 762 [200 P. 818] ; *Houghton* v. *Loma Prieta Lumber Co.,* 152 Cal. 574 [93 P. 377].)'' (57 Cal.App.2d, pp. 731-734. Italics added.)

 Respondent contends that the Brant case is controlling here, but we are unable to agree with this contention. The basis of this court's decision in the Brant case was that the expert witness there assumed a different state of facts than those observed by the attending physician, and because his opinion was partially based upon erroneous assumptions it created no conflict as against the positive, uncontradicted factual evidence given by the attending physician. However, in the instant case it was stipulated that Dr. du Bray had read all of the testimony at the hearing, including that of Dr. Wilson and Dr. Behneman, and it is clear from a reading of his testimony that his opinion that Dornell's death was not due to any injury received while in the performance of his duties as fireman was based upon the entire record of that testimony. The following appears in his testimony:

''Mr. Bianchi. Q. As a result of reading all of them, which you just testified to have read, and which it has been stipulated you did read, did you come to any conclusion as to whether the death of Lloyd Dornell was due to an injury received in the performance of his duty as an employee of the Fire Department of the City and County of San Francisco. A. I have come to a conclusion. Q. Is it your conclusion that his death was or was not due to an injury received in the performance of his duty as a fireman in the service of the City and County of San Francisco? A. I think his death was due to non-occupational causes. Q. Your answer is, you think that his death was not due to an injury sustained while in the performance of his duties as a fireman of the City and County of San Francisco? A. That's right. . . . To sum the whole thing up, I think that we have here a man who is a little hypertensive for a year or two at least before he has this influenza. He has a respiratory infection which was an incidental thing, and not occupational. He returned to work. He is possibly never quite right in general energy and strength but has nothing to suggest anything wrong with him in his brain. He ruptured a blood vessel spontaneously, without any immediate history of effort previous to it—that is, just immediately previous to January 5th; that he is in bed then continuously until February 11th when, on the opposite side of the brain, he develops a larger

hemorrhage which throws out the motor functions of the whole opposite side of the body, which was the right side, and then dies of a terminal bronchial pneumonia. . . . Mr. Bianchi. Q. Do you believe that the work of December 17th, 1940—doctor, is it your opinion that the work on December 17th, 1940, was the proximate cause of the cerebral hemorrhage on January 5th, 1941? A. No. I don't. Q. Do you feel that it was the proximate cause of the cerebral hemorrhage on February 12th, 1941? A. No."

In our opinion, the instant case is clearly distinguishable from the Brant case. We are convinced that the testimony of Dr. du Bray created a conflict in the evidence and was substantial evidence to support the determination of the appellant board. As was stated in *Sales* v. *Bacigalupi,* 47 Cal. App.2d 82, at page 86 [117 P.2d 399]: "Dr. Ruedy's testimony created a conflict in the evidence and is sufficient to support the verdict. The testimony of a medical witness in answer to a hypothetical question based on the facts in the record is sufficient to support a finding contrary to the testimony of other medical witnesses who have seen and examined the patient. (*Nielsen* v. *Industrial Acc. Com.,* 220 Cal. 118 [29 P.2d 852]; *Alaska Packers' Assn.* v. *Industrial Acc. Com.,* 1 Cal.2d 250 [34 P.2d 716].) Nor can the fact that Dr. Ruedy's testimony conflicted with all the other medical testimony affect this rule since the testimony of one credible witness if believed by the jury is sufficient to support a verdict."

The following language of the court in the case of *Bennett* v. *Brady,* 17 Cal.App.2d 114, at page 118 [61 P.2d 530], might well be applied to, the instant case: "Petitioner, upon a detailed analysis of each expert's reasons for his opinion, in which she stresses agreements and minimizes differences, argues that while the literal wording of the second expert's conclusion as to the cause of death differs from that expressed by the first, yet in reality his opinion accords with that of the first. Such argument, in that it involves the weight and effect of testimony and its interpretation, might properly be addressed to respondents as the triers of fact but cannot be considered by a court as proof that the two opinions did not conflict. Respondents, however, were not concluded by the opinion of either expert but could draw their own conclusions from the facts shown by the testimony. (*Bach* v. *C. Swanston & Son,* 105 Cal.App. 72 [286 P. 1097].) The death certificate was *prima facie* evidence of the cause of death.

(*Longuy* v. *La Societe Francaise*, 52 Cal.App. 370 [198 P. 1011].) Deceased's recovery from the heart injury received in the drill could be reasonably inferred from the length of time elapsing between his return to duty and his death. The case of *Buckley* v. *Roche, supra* [214 Cal. 241 (4 P.2d 929)], is readily distinguishable from the instant case because there the evidence did not present a conflict as to the cause of death since the parties had stipulated that the police officer's death was caused by a heart spasm resulting from his ascension of a stairway in the performance of his duty. Since the evidence as to the cause of death was conflicting, respondents were authorized to decide such conflict and their decision cannot be controlled by mandate. (*Klevesahl* v. *Byington*, 1 Cal. App.2d 671 [37 P.2d 179].)''

█ It is true that pension laws are to be liberally construed and applied to the end that the beneficent policy thereby established may be accorded proper recognition. (*Brant* v. *Retirement Board of S. F., supra; Dillard* v. *City of Los Angeles*, 20 Cal.2d 599 [127 P.2d 917]; *Casserly* v. *City of Oakland*, 215 Cal. 600 [12 P.2d 425].) █ But it also is true that the city charter confers judicial powers upon the appellant board, and that its findings, based upon conflicting but sufficient evidence, are binding upon the court. It was the function of the appellant board, under the charter, to determine from the evidence before it whether the death of Lloyd Dornell resulted ''from sickness clearly, unmistakably and directly caused by and resulting from the discharge'' of his duties as a member of the San Francisco Fire Department. The board decided in accordance with the opinion of Dr. du Bray, even though his opinion was opposed to those of Dr. Wilson and Dr. Behneman. While we believe that, upon the record before us, the board might well have decided in favor of petitioner, and while we believe further that the weight of the evidence is with respondent, we cannot hold that its determination against petitioner does not find substantial support in the record.

In view of the foregoing, our conclusion is that the trial court erred in holding that respondent was entitled to a writ of mandate compelling the granting of a pension to respondent, and that the judgment should be and is hereby reversed.

Peters, P. J., and Ward, J., concurred.

A petition for a rehearing was denied January 12, 1946.