[Civ. No. 13968. First Dist., Div. One. June 25, 1949.]

MYRTLE MARSHALL, Appellant, v. CITY OF OAKLAND, et al., Respondents.

594

George C. Perkins for Appellant.

John W. Collier, City Attorney, for Respondents.

WARD, J.—This is an appeal from the judgment denying the peremptory writ of mandate set forth in the petition, the basis of which was that the husband of petitioner, William Marshall, who was a member of the Police Department of the city of Oakland, ''died as a result of an injury and a disability incurred in the performance of his duties.''

Following the death of William Marshall petitioner filed an application, before respondents as trustees of the police relief and pension fund, that she be awarded a pension pursuant to section 96(1) (a) of the municipal charter. Petitioner's application was denied by the trustees and the mandate proceedings followed.

Section 96(1)(a) of the charter provides for a pension to a widow, as long as she shall remain unmarried, equal to one-half of the salary attached to the rank held by the decedent at the time of his death if he died as the result of an injury or disability incurred while in the performance of his duty.

Irrespective of the manner in which appellant seeks to present the question on appeal the real issue is whether appellant has sustained the burden of proof that her husband died as a result of injury sustained in the performance of his duty as a member of the police department. Primarily this is a factual case. In the superior court the following evidence was admitted in the place of testimony of lay witnesses: ''Transcripts of the testimony which has heretofore been heard in connection first with an application before the Industrial Accident Commission . . . for an award for compensation for the death of her husband; a deposition of the widow taken during this proceeding by the City Attorney's office; and the

testimony produced before the Board of Trustees by the applicant and by the City Attorney's office, together with a report made by a physician concerning an examination made of the deceased, William Marshall, in February of 1941.''

An ''overall summary'' of the evidence was introduced without objection before the superior court. In part it sets forth: ''Marshall had been appointed to the Oakland Police Department on August 2nd, 1917, as a patrolman and served continuously thereafter as a member of said department until his death. He was appointed an Inspector of Police on July 1st, 1936, and was assigned to the Robbery Detail at the time of his death. Marshall was born August 21, 1890, and was 53 years and 7 months of age when he died. The immediate circumstances of his death were as follows: He had arrived home from work at approximately 5 P. M. on March 22nd, 1944, removed his coat and shirt and put on a sweater over his undershirt. He helped feed his youngest child, read the paper for a short while in the living room, ate only a dish of peaches, assisted his wife in cleaning and washing the dishes, and then went into the back yard of his home, picked up a garden hose preparatory to putting some water in the fish pond, when he suddenly slumped to the ground, gasping for breath for a short while, and then died before medical aid could be summoned. . . . No autopsy was performed. The death certificate was signed by Doctor Robert G. Libby, M.D., on March 23, 1944. Doctor Libby certified the immediate cause of death to be coronary occlusion, duration one-half hour, due to hypertensive heart disease, duration three years, and chronic myocarditis, duration three years. Doctor Libby had examined Marshall in his office in February, 1941, and had made the following report: 'Mr. Marshall first reported to this office in February of 1941, complaining of severe dyspnea, upon exertion, fatigue and occasional chest pains. The pertinent findings of my physical examination and x-ray, fluoroscopy of the heart and lungs, revealed an overweight male, approximately 50 years of age, with bad teeth and pyorrhea of the gums. The blood pressure was 190 cystolic over 110 diastolic. The heart was enlarged to the left. The radial blood vessels were moderately sclerosed. I made the following diagnosis: 1. Hypertensive heart disease. 2. Moderate arteriosclerosis. 3. Left ventricular hypertrophy. 4. Coronary artery insufficiency. The patient was given a reducing diet and dental care was advised. He was cautioned to restrict his activities. Digitalis and amino-phyllin with

luminal were prescribed. Mr. Marshall reported to this office at occasional intervals until his death in March, 1944, and he continued the above medication all during that period. In addition to the above diagnosis, he suffered from influenza in January and February, 1944. I prescribed a tonic of Abbots Elixir Cofron with Vitamin B for post influenza malaise on February 15, 1944. He passed away suddenly, on March 22nd, 1944.' ''

From the time of his marriage to the applicant on July 26, 1936, until October 12, 1943, the deceased was never seriously ill. On that day he had a light attack of influenza. He began to lose weight, complained of what he called indigestion and began to tire more easily. About February 11, 1944, he went to Los Angeles with another police inspector by automobile. They were there three days during which time they did considerable walking between city hall and the federal building and some stair climbing. While there Marshall contracted a lung congestion, had a slight fever, and his nasal passages seemed stopped up, but he did not consult a doctor or remain in bed during the day. Upon arriving home on February 14 he went right to bed and he appeared to be very sick. He went to work the following morning but was brought home at 1:30 p.m. He reported back to work on the 22d. During the next two weeks he sat up all night on two occasions. On March 4, 1944, he investigated a robbery which required fast work combing an entire neighborhood of hotels and rooming houses, one of which was three stories high, none of which had elevators. The following day Marshall looked pale and tired and said that the exertion from climbing stairs the previous day had made his heart go faster.

Marshall and his partner, Inspector Eugene Murphy, handled the investigation of about 50 robberies from March 7th to 22d, each involving the climbing of stairways. In his last days Marshall would remain in the automobile while Murphy went into the building, unless they feared gun play.

There is also evidence of a fall on the steps of the city hall. Appellant refers to evidence that this occurred between March 4th and his death. Respondent, on the other hand, refers to the testimony of Inspector Vernon that it occurred in the spring of 1943. On March 22, 1944, Marshall went with Murphy to San Francisco. They worked with San Francisco and Los Angeles police investigating a Los Angeles murder case.

In his apartment house, of which he was the manager, Mar-

shall went up and down five or six steps to a landing and then five or six more steps to the second floor. Every other Saturday when he was off duty he vacuumed the hall carpet and the stair runners which went up three flights. Once every two or six months he made minor plumbing repairs in the various apartments. He cut the small lawn every two weeks up to October of 1943, after which his stepson performed this work.

█ Where an officer or patrolman of a police department governed by a pension law "dies as a result of a pre-existing disease of the heart and it is established that the disease has been aggravated and death accelerated or precipitated by exertion in performing the duties of his office" his widow is entitled to pension benefits (*Naughton* v. *Retirement Board of S. F.*, 43 Cal.App.2d 254 at 256 [110 P.2d 714]; citing *Buckley* v. *Roche*, 214 Cal. 241 [4 P.2d 929]) unless a contrary provision appears in the governing pension law. In this case it is not claimed that the charter of the city of Oakland providing for a police relief and pension fund contains such exception.

Four physicians appeared as witnesses, none of whom had examined Marshall. They may be referred to generally as specialists. They testified that evidence taken in other proceedings had been read and conclusions reached. The first expert witness testified that previous activities as a police inspector had hastened death. The second witness testified that such activities must have been a factor in producing an early death. The third witness testified, "No, I don't believe that his exertions as indicated in the testimony that I have read played any role whatsoever in the causation of his death." The fourth witness testified: "Q. Doctor, there has been some evidence this morning as to four possible causes of death; one, a coronary artery thrombosis; two, a rupture of a previously damaged heart; three, a hemorrhage of a previously enlarged vessel some place in the body; and four, I am going to have to call on the Court again. THE COURT: A change in the rhythm of the heart. MR. COLLIER: Q. Now, Doctor, in your opinion—— THE COURT: (Interrupting) A physiological change. MR. COLLIER: Q. Did the activities and exertions of Mr. Marshall, as indicated by the evidence in this case, precipitate his death as it occurred and under the conditions in which it occurred, from any one of those causes? A. No, I think not."

■. It may be assumed that there is no conflict in the evidence that the deceased was suffering from a preexisting heart ailment and no conflict as to the immediate cause of death. There is conflict as to the fact whether previous exertions of the deceased in the performance of his official duties aggravated the heart ailment and whether such aggravation precipitated death. There is some evidence from the physicians who testified that the "exertions" had not hastened death, that they would have restricted Marshall's activities as a matter of precaution, but, upon death, the actual facts were interpreted as showing that Marshall's physical exertions had not precipitated death. That physicians would have advised restriction upon exertions could well be considered by the triers of the facts in determining the correctness of the conclusion of certain expert witnesses, but the evidence of the experts which is in accord with the finding that Marshall did not die as the result of an injury or disability incurred in the performance of his duty, which was accepted by the court, is binding on this appeal. In *Brant* v. *Retirement Board of S. F.*, 57 Cal.App.2d 721, at page 734 [135 P.2d 396], this court stated: "While it is true that an appellate court has no power to set aside findings of a judicial body vested with fact finding power when such findings are based on conflicting evidence, it is equally well settled that for that rule to apply the conflict must be substantial and real and not fanciful or fictitious."

■ The burden of showing a causal connection between the death of a person and the work performed by him rests with the person seeking a pension. As stated in *Loveland* v. *City of Oakland*, 80 Cal.App.2d 31, at page 34 [180 P.2d 937], "The burden was upon appellant to establish the cause of death (*Ellenberger* v. *City of Oakland*, 59 Cal.App.2d 337 [139 P.2d 67]) and in the face of the adverse finding below she bears the heavy burden before this court of showing, not that the evidence will support a finding that her husband's service-connected injury caused his death, but rather that it will not support the contrary finding actually made."

It is noteworthy that the attending physician stated that Marshall "was cautioned to restrict his activities," but neither in the history of the case nor in the death certificate is there any language which may be reasonably construed as indicating that official activities precipitated or accelerated death.

The judgment entered is affirmed.

Peters, P. J., and Bray, J., concurred.